JOHN H. FRITSCH AND JOSEPHINE M. FRITSCH, APPELLANTS, V HILTON LAND & CATTLE COMPANY, A CORPORATION, AND SOUTHWEST NEBRASKA PRODUCTION CREDIT ASSOCIATION, APPELLEES.

513 N.W.2d 534

Filed April 1, 1994. No. S-91-540.

T.J. Hallinan, of Cobb, Hallinan & Ehrlich, P.C., for appellants.

Waldine H. Olson and Thomas W. McPherson, of Schmid, Mooney & Frederick, P.C., for appellee Hilton Land & Cattle Co.

HASTINGS, C.J., BOSLAUGH, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ.

PER CURIAM.

After a trial, the district court for Red Willow County dismissed the amended petition of John H. Fritsch and Josephine M. Fritsch (the purchasers), in which they sought to rescind a 1981 agreement to purchase certain real estate from the defendant Hilton Land & Cattle Company (Hilton), a Nebraska corporation, and obtain a refund of $131,062.80.

The 298 acres of land involved in the 1981 agreement was included in the 1,025 acres of land the purchasers originally sold on contract to Hilton in 1976. Not all provisions of the 1976 contract had been fulfilled at the time the 1981 contract was executed or at time of trial of this lawsuit.

The trial court also found in favor of Hilton on its counterclaims seeking specific performance by the purchasers not only of the 1981 contract, but also of the 1976 contract, which was referred to in the 1981 agreement.

The purchasers appealed to this court the dismissal of their cause of action and the entry of judgment against them. Claiming that this court lacked jurisdiction because there was no final order, Hilton filed two motions to dismiss the purchasers' appeal. We reserved ruling on the motions until after argument of the case.

We find that (1) the trial court's order denying the purchasers rescission of the 1981 contract was a final and appealable order, (2) the trial court erred in denying the purchasers' rescission of the 1981 agreement, and (3) the cause should be remanded for further proceedings consistent with this opinion.

## ASSIGNMENTS OF ERROR

The purchasers claim that the trial court erred in finding that (1) the purchasers were not entitled to rescind the 1981 contract,

(2) Hilton was entitled to specific performance of the 1981 contract, (3) explorations conducted and payments made pursuant to the 1976 contract constituted waiver of the purchasers' contractual right to rescind the 1981 contract, and (4) unpaid fertilizer and pesticide billings constituted waiver of the purchasers' contractual right to rescind the 1981 contract.

## STANDARD OF REVIEW

An action to rescind a written instrument is an equity action. *In re Estate of Stephenson*, 243 Neb. 890, 503 N.W.2d 540 (1993). Likewise, an action for specific performance sounds in equity. *Sayer v. Bowley*, 243 Neb. 801, 503 N.W.2d 166 (1993).

In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, when credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *In re Estate of Stephenson, supra.*

## FACTS

In 1973, by written contract for $250,000, William Spader and his wife purchased 1,040 acres of land in Red Willow County from Griffith and Carol Helm. The Spaders subsequently assigned an undivided one-half interest in the contract to John Fritsch. In 1976, Fritsch, Spader, and their wives contracted to sell Hilton 1,025 acres of the 1,040 acres for $307,500 (1976 contract).

In 1978, Hilton obtained a $750,000 line of credit from the Southwest Nebraska Production Credit Association (PCA). As security, a $717,358.58 mortgage was given to the PCA on the entire 1,040 acres. Hilton Land & Cattle Company is listed as the mortgagor on the mortgage. Signatories to the mortgage were Kenneth A. Hilton and his wife, Peggy L. Hilton. Kenneth Hilton is president and his wife is secretary of Hilton. Together, the Hiltons own all of the stock in the corporation. The PCA mortgage, however, fails to reflect that either of the Hiltons executed or acknowledged the mortgage in a corporate capacity on behalf of the corporation. The copies of the mortgage

received in evidence also fail to reflect that the mortgage carried Hilton's corporate seal.

On November 24, 1981, the Fritsches and the Spaders, by written contract, agreed to repurchase 298 acres of the tract they had sold to Hilton (1981 contract). The repurchase price was $300,000. The purchasers' attorney at that time testified at trial that she had advised her clients not to execute the agreement until such time as she had the opportunity to review the abstract. However, that attorney testified that when the parties met to sign the contract, the attorney representing Hilton said that the title to the property was free and clear and asked Kenneth Hilton, "Isn't that true, Ken?" The purchasers' November 24, 1981, attorney testified further that "Ken affirmed that the title to the property was free and clear." At trial, Hilton's former counsel testified that on November 24, 1981, he was unaware of the $717,358.58 mortgage that had been given to the PCA. He could not recall making any statement on November 24, 1981, that the title to the 298 acres was free and clear.

The 1981 contract provided that payments due from Hilton to the purchasers under the 1976 contract were to be credited to Hilton as installments due under the 1981 contract on March 1, 1982, through March 6, 1985, both inclusive. The purchasers were then to make a final balloon payment of $228,065.20 on March 1, 1990.

The 1981 contract further provided that beginning in 1986, the unpaid balance of the purchase price would be subject to interest accruing at 7 percent per year until receipt of the final payment. In addition, the 1981 contract provided that from March 1, 1983, to March 1, 1990, Hilton would pay the purchasers a share of the crops and pasture rent for use of the 298 acres. During the same period, the purchasers were to pay Hilton a portion of the chemical and fertilizer expenses incurred in the production of crops on the property. The record reflects that Hilton never set over to the purchasers, or set aside for the purchasers, a landlord's share of the crops raised on a portion of the 298 acres involved in the 1981 contract and that the purchasers never paid Hilton what was to be the purchasers' share of the chemical and fertilizer costs in raising the crops. In

early March 1983 and early March 1984, Hilton paid the purchasers $2,485.20 as pasture rent for each of those years. However, no pasture rent was paid for the year beginning March 1, 1985, or thereafter. Because this court is granting the purchasers' prayer for rescission of the 1981 contract, upon remand, the principles of equity and justice require that the purchasers should account to Hilton for the pasture rent that Hilton paid to them. By the same token, on remand, the purchasers are entitled to any credits Hilton received under paragraph 3.2 of the 1981 contract.

The closing on the 1981 contract was to be on or before December 24, 1981, unless extended by agreement of the parties. The purchasers were not to have possession of the 298 acres until the 1981 contract was closed. Before a closing could be held, it was necessary for the purchasers, at their own cost, to obtain a survey of the land they were buying. That survey was provided to Hilton by letter mailed July 5, 1984. The record reflects that there has never been a closing on the 1981 contract.

At trial, John Fritsch testified that in April or May 1982, he heard a rumor that Hilton had mortgaged the property. By that time, Hilton had not provided an abstract of title to the property updated to November 24, 1981. The 1981 contract required Hilton to do so within a reasonable time after November 24, 1981. Shortly after Fritsch heard the rumor about the mortgage, the purchasers' then attorney telephoned the Red Willow County register of deeds and was advised that the PCA mortgage did, in fact, exist. At the urging of the purchasers' then attorney, Hilton produced an abstract and delivered it on or about August 16, 1982, to the purchasers' then attorney. That abstract had not been extended to November 24, 1981, and did not contain an entry reflecting the 1978 PCA mortgage. The purchasers' then attorney, on her own initiative, obtained a supplemental abstract extended to October 25, 1982. The supplemental abstract confirmed the existence of the 1978 mortgage to PCA in the principal sum of $717,358.58 on the entire 1,040 acres of land.

In late 1984 or early 1985, the attorneys for both the parties began settlement negotiations verbally and by letter. The attorney who previously represented Hilton testified that in

April 1985, Hilton was waiting to hear from the PCA regarding Hilton's request for a partial release of the mortgage regarding the 298 acres. The attorney also testified that he had told the purchasers' attorney that Hilton was ready, willing, and able to provide a partial release to the 298-acre tract. However, it was not until May 29, 1985, that Hilton assigned its right to payments under the 1981 contract to the PCA. And it was not until July 16, 1985, several days after this suit was filed, that the PCA executed a partial release of its mortgage as to the 298-acre tract and delivered it to the State Bank of Bartley, Nebraska, to be held in escrow until the bank received Hilton's proceeds from the 1981 contract.

On or about July 9, 1985, after settlement negotiations appeared to have deteriorated, the purchasers filed this action for rescission and for return of $131,062.80 that they claim was paid or credited to Hilton pursuant to the 1981 contract. In July 1985, Spader and his wife went bankrupt. In their federal bankruptcy proceeding, the Spaders and the trustee in bankruptcy abandoned any interest they had in the property involved in this lawsuit and in the lawsuit itself.

On August 20, 1986, while this case was pending in the district court for Red Willow County, Hilton filed for reorganization under chapter 11 of the federal Bankruptcy Act. On May 26, 1988, the U.S. bankruptcy judge permitted the parties to proceed in the Nebraska district court.

In its answer to the purchasers' petition, Hilton claimed that the rescission of the real estate contract by the purchasers was barred by laches, waiver, unclean hands, and estoppel. Hilton counterclaimed for specific performance of both the 1976 and 1981 contracts.

After trial in 1991, the district court denied the purchasers' rescission of the 1981 contract and granted Hilton specific performance of the 1976 and 1981 contracts. The district court found that (1) the purchasers had accepted benefits of the 1981 contract by way of mineral exploration and pasture rent and (2) the purchasers had participated in the extension of time to perfect title and failed to bring the mutual delay to a close. The district court determined that Hilton was entitled to time to deliver good title, provided the purchasers performed their

obligations under the 1981 contract.

The court further ordered: "Since some of the amounts due as between the parties have been established, but no accounting has been made or pled respecting the crop rentals due the plaintiff, specific orders on amounts to be paid by the parties is [sic] not determinable in this order."

The purchasers appealed the district court's ruling to this court. Hilton filed two motions to dismiss the appeal, arguing that the trial court had not entered a final order because there remained before the district court an accounting and inquiry into the amounts due under 1981 agreement and the leases contained therein.

## ANALYSIS

### APPEALABLE ORDER

At the hearing in this court, Hilton reversed its prior position and claimed that the trial court had entered a final order. An appellate court is not bound by the parties' acquiescence or consent as to whether a district court has entered a final order which would confer jurisdiction upon the appellate court. See *Anderson v. HMO Nebraska*, 244 Neb. 237, 505 N.W.2d 700 (1993).

For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken. Neb. Rev. Stat. § 25-1912 (Reissue 1989). Conversely, an appellate court is without jurisdiction to entertain appeals from nonfinal orders. See, *Jaramillo v. Mercury Ins. Co.*, 242 Neb. 223, 494 N.W.2d 335 (1993); *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991). In the absence of a final order from which an appeal may be taken, the appeal must be dismissed for lack of jurisdiction. *Brozovsky v. Norquest*, 231 Neb. 731, 437 N.W.2d 798 (1989).

Neb. Rev. Stat. § 25-1902 (Reissue 1989) provides that a final order is "[a]n order affecting a substantial right in an action, when such order in effect determines the action and prevents a judgment, and an order affecting a substantial right made in a special proceeding, or upon a summary application in an action after judgment."

There is no doubt that the trial court's dismissal of the

purchasers' petition for rescission is a final order because it prevents a judgment in favor of the purchasers. See *Akins v. Chamberlain*, 164 Neb. 428, 82 N.W.2d 632 (1957).

Our finding that the purchasers' rescission of the 1981 contract was valid invalidates the order of the district court granting Hilton's request for specific performance of the 1981 contract, and Hilton's counterclaim for specific performance of that contract should be dismissed.

Because the trial court's specific performance order in regard to the 1976 contract lacks specificity, it cannot be considered an enforceable final order.

A decree for specific performance must as nearly as possible order the contract's performance according to its terms.

> In decreeing specific performance, a court of equity must require the performance of some certain and specific act which ought to be performed by the delinquent party, and it cannot enter a general decree that in the future the delinquent party shall perform the acts required of him by his contract.

71 Am. Jur. 2d *Specific Performance* § 221 at 287 (1973). See, also, *Morgan v. United States Fidelity & Guaranty Co.*, 191 So. 2d 851 (Miss. 1966) (decrees ordering specific performance should state what the defendant must do without reference to other documents and without the necessity of interpreting other documents).

Therefore, on remand, the district court should enter a final, enforceable order for specific performance of the 1976 contract which, as nearly as possible, sets forth what is required of the purchasers under the contract.

### RESCISSION

The terms of the 1981 contract govern the rights and duties of the parties in regard to that contract. A written contract expressed in unambiguous terms is not subject to interpretation or construction, and the intention of the parties to such a contract must be determined from its contents. *Properties Inv. Group v. Applied Communications*, 242 Neb. 464, 495 N.W.2d 483 (1993). Words used in a contract must be given their plain and ordinary meaning, as ordinary, average, or reasonable

persons would understand them. *Prawl Engineering v. Charles Vrana & Son Constr.*, 241 Neb. 49, 486 N.W.2d 24 (1992).

The terms of the 1981 contract relevant to this action state:

6.1 Upon execution of this agreement, or within a reasonable time thereafter, Seller shall, at his own expense, furnish to the Purchaser an abstract or abstracts of title to the premises, updated to the date of this agreement. Purchaser shall have the right to have an attorney of his choice examine the abstract. *If the abstract discloses. any title defects not consented to by the Purchaser, the Seller shall have a reasonable time in which to remedy and/or remove any such title defects. . . .*

6.2 *If the Seller does not so remedy or remove such title defects, the Purchaser may* either (A) complete the purchase of the property and accept title thereto as Seller is able to convey without a reduction in the purchase price, unless such title defects are encumbrances or liens for an ascertainable amount, in which case that amount may be deducted from the purchase price, *or (B) at any time prior to closing declare this agreement null and void.*

(Emphasis supplied.)

Section 8.1 of the 1981 agreement provides, "Closing date for this agreement shall be on or before <u>December 24</u>, 1981, unless extended by agreement of the parties hereto."

Section 8.2 of the 1981 contract provides, "It is understood and agreed by the parties that possession of the property shall be given to the Purchaser at closing."

It is clear from the evidence in this case that a future closing date for the 1981 contract agreement was necessary because the contract called for Hilton to furnish the purchasers an abstract free of any title defects that the purchasers had not waived.

In the 1981 contract, the purchasers had agreed that the 1973 real estate purchase agreement involving the Helms would not be considered a title defect. As to any other defects not consented to by the purchasers, the contract provided that Hilton would have a reasonable time in which to convey a clear title to the purchasers. What constitutes a reasonable time for the performance of a contract must be determined from the general nature and circumstances of each case. *Chilton Accts.*

*Rec. Mgmt. v. Project Life Min.*, 225 Neb. 482, 406 N.W.2d 133 (1987).

In this case, Hilton had to be aware that the PCA mortgage existed when it executed the 1981 contract. Just 3 years earlier, Hilton had obtained a $750,000 line of credit from the PCA. It was at that time that the PCA was given a $717,358.58 mortgage on the land. It is undisputed that Kenneth A. Hilton's signature appears on the PCA mortgage, as well as that of his wife, Peggy L. Hilton, although it is not apparent from the mortgage that they executed it in their corporate capacities. Nevertheless, when asked on November 24, 1981, whether title to the property was free and clear, Kenneth Hilton assured the purchasers that Hilton had clear title to the land.

Hilton never provided the purchasers with an updated abstract showing the PCA mortgage. Instead, the purchasers had to learn about the PCA mortgage through rumor and through their attorney's investigation. The purchasers' then attorney had to order a supplemental abstract to confirm that a $717,358.58 mortgage on the land had existed since 1978 in favor of the PCA.

Under paragraphs 7.1 and 7.2 of the 1981 contract, Hilton was required to prepare and execute a warranty deed conveying title of the property to the purchasers and to place the deed in escrow. After the purchasers provided a survey of the land to Hilton in early July 1984, Hilton prepared a warranty deed, which was backdated to November 24, 1981. It was not acknowledged by Hilton's president until February 20, *1990*, long after this lawsuit was filed. Although the purchasers had agreed to accept title to the 298 acres subject only to the Helm agreement, the deed prepared by Hilton did not comply with that provision of the 1981 contract. Hilton's deed warranted only that the land was free from encumbrance *except those of record*. On November 24, 1981, the $717,358.58 PCA mortgage was of record.

Moreover, Kenneth Hilton and his wife, Peggy Hilton, executed and acknowledged the mortgage to the PCA without reference to whether they were acting as officers of Hilton. The corporation's seal was not placed on the mortgage. By these omissions, there was a cloud upon the title to the real estate as to

whether Kenneth Hilton and his wife had some personal interest in the land which would require a disclaimer of interest or quitclaim deed from them personally. The record fails to reflect that such a disclaimer or quitclaim deed has ever been prepared for delivery to the purchasers.

Under the terms of the 1981 contract, it was the duty of Hilton to cure any unconsented-to defect in title within a reasonable time. Although Hilton's president knew of the title defect due to the $717,358.58 mortgage when he executed the 1981 contract, he did nothing to cure the defect until the purchasers' attorney complained about the defect in late 1984 and early 1985. Under the 1981 contract, if Hilton failed to cure any unconsented-to defects, the purchasers could rescind the agreement at any time prior to closing. No closing was ever held on the 1981 contract. Under these circumstances, Hilton failed to cure a defective title within a reasonable time, and the purchasers had a right to exercise their contractual right to rescind.

In determining whether a rescission took place, courts look not only to the language of the parties but to all the circumstances. *Lustgarten v. Jones*, 220 Neb. 585, 371 N.W.2d 668 (1985). Before filing this suit for rescission, the purchasers indicated to Hilton that they wanted to rescind. In a letter to Hilton's attorney dated April 8, 1985, the purchasers' attorney stated:

> I guess it gets down to that there is no way your man can come up with a clear title to that property. Under the terms of the agreement, he has to do this or he gets no money. . . .
>
> I assume that by now you haven't heard from P.C.A. on the matter. My feeling as to a settlement would be that we declare the contract null and void, and that we would work out an arrangement whereby your man will pay back a percentage.

Whether or not this letter or subsequent actions of the purchasers constituted an effective rescission, the purchasers certainly exercised their right to rescind when they filed their petition for rescission on July 9, 1985. When a party seeks the aid of a court to rescind a contract, the bringing of the action is sufficient disaffirmance of the contract for purposes of the

action. *Haumont v. Security State Bank*, 220 Neb. 809, 374 N.W.2d 2 (1985). On rescission of a contract, the rights and duties which have accrued under the rescinded contract are terminated and nullified. *Lustgarten v. Jones, supra.* See, also, *Robinson v. Bressler*, 122 Neb. 461, 240 N.W. 564 (1932); 17A C.J.S. *Contracts* § 440 (1963). Therefore, once the purchasers exercised their right to rescind the contract by filing this action, Hilton's contractual right to cure the defect terminated.

Prior to the filing of this action by the purchasers, Hilton apparently had begun its efforts to cure a major defect in the title by attempting to negotiate with the PCA for a partial release of its mortgage. However, the PCA did not grant a partial release of its mortgage until July 16, 1985, more than 3 years after execution of the contract, 3 months after the purchasers' attorney sent Hilton a letter indicating that the purchasers wanted to rescind, and 7 days after the purchasers filed their action to rescind. Hilton's attempts to cure the defect after the purchasers rescinded the contract do not invalidate the purchasers' rescission of the 1981 contract.

### EQUITABLE DEFENSES

In its answer, Hilton asserts that the equitable defenses of laches, waiver, unclean hands, and estoppel should bar rescission of the 1981 contract. Hilton does not discuss each of these defenses separately in its brief, but essentially claims that the purchasers waived their right to rescind the 1981 contract by waiting too long to exercise that right and by accepting certain benefits of the 1981 contract.

It is true that the purchasers did not attempt to rescind the contract until about 2 years after they became aware of PCA's mortgage. However, the defense of laches is not favored in Nebraska. It will be sustained only if a litigant has been guilty of inexcusable neglect in enforcing a right to the prejudice of his adversary. *Hanthorn v. Hanthorn*, 236 Neb. 225, 460 N.W.2d 650 (1990). Laches does not result from the mere passage of time, but from the fact that during the lapse of time, circumstances changed such that to enforce the claim would work inequitably to the disadvantage or prejudice of another. *Kracl v. Loseke*, 236 Neb. 290, 461 N.W.2d 67 (1990).

Hilton has produced insufficient evidence to show that during the time before the purchasers rescinded the contract, circumstances changed to such a degree that Hilton would be prejudiced if the contract were rescinded. Rather than being prejudiced by the delays, Hilton has enjoyed the full use and possession of the property ever since the contract was executed in 1981. Except for 2 years' pasture rent totaling $4,970.40, which it paid to the purchasers, Hilton has retained all the benefit of the proceeds from the crops raised on the 298 acres. Given these circumstances, we are unable to find that Hilton has been prejudiced by the purchasers' failure to rescind the 1981 contract sooner than they did.

Hilton contends in its brief that the purchasers waived their right to rescind the 1981 contract because they (1) allowed payments due them under the 1976 contract to be credited to Hilton as installments due under the 1981 contract, (2) received benefits from their assignment of the mineral and gravel rights to the property, and (3) accepted 2 years' pasture rent from Hilton.

A waiver is a voluntary and intentional relinquishment of a known right, privilege, or claim, and may be demonstrated by or inferred from a person's conduct. In order to establish a waiver of a legal right, there must be clear, unequivocal, and decisive action of a party showing such a purpose, or acts amounting to estoppel. *Shelter Ins. Cos. v. Frohlich*, 243 Neb. 111, 498 N.W.2d 74 (1993).

Hilton claims that the purchasers waived their right to rescind by allowing credits to accumulate on the 1976 contract, or in other words, ratifying the 1981 contract. We find no clear, unequivocal, or decisive action by the purchasers to establish such a ratification or waiver of their right to rescind. We do not find that the purchasers ever acknowledged that credits had been made in their favor on the 1976 contract. There appears to be no evidence that either party contacted the State Bank of Bartley, the escrow agent, to determine whether such credits were being recorded, nor did the bank notify the purchasers that credits were accumulating under the 1976 contract.

Even if credits were in fact made, the purchasers received no benefit from such credits. While the purchasers received no

monetary payments on the 1976 contract during the time such credits were supposed to have been made, neither did they receive a clear title to the property under the 1981 contract. Under the record in this case, we are unable to find that any inaction on the part of the purchasers during this time ratified the 1981 contract or waived the right the purchasers had to rescind the 1981 contract.

In its second argument regarding waiver, Hilton claims the purchasers benefited from the 1981 contract by way of mineral exploration. This argument has no merit. Any benefits of mineral exploration or rights to gravel enjoyed by the purchasers were granted originally under the 1976 contract. Similar rights were granted to the purchasers under the 1981 contract. Because the 1981 contract became a nullity, the purchasers still had their rights to mineral exploration and gravel under the 1976 contract.

Hilton's final claim of waiver suggests that the purchasers waived their right to rescind by accepting 2 years' pasture rent pursuant to the 1981 contract. That rent amounted to about $4,970.40, a fraction of the $300,000 contract purchase price. Given the relatively small amount paid in pasture rent and the other circumstances of this case, we find that the purchasers' acceptance of this rent did not amount to an unequivocal act of waiver that would bar rescission. In determining what amounts, if any, are owed to either party by the other under the 1976 contract or the rescinded 1981 contract, under the principles of equity and justice, the trial court must take into account the effect of our determination that the purchasers' rescission of the 1981 contract was valid. This would include giving Hilton credit for the pasture rent it paid to the purchasers. Since Hilton retained the benefit of all the crops raised on the land involved in the rescinded 1981 contract, the principles of equity and justice would not require the purchasers to pay for any chemicals or fertilizer that Hilton used on the 298 acres involved here.

Hilton does not discuss the defense of unclean hands in its brief, but claimed in its pleadings that because the purchasers refused to pay real estate taxes and their share of fertilizer and chemical expenses, the purchasers' rescission of the 1981

contract should be barred by the doctrine of unclean hands. Under the doctrine of unclean hands, a person who comes into a court of equity to obtain relief cannot do so if he or she has acted inequitably, unfairly, or dishonestly as to the controversy in issue. *Grone v. Lincoln Mut. Life Ins. Co.*, 230 Neb. 144, 430 N.W.2d 507 (1988).

With regard to the unpaid real estate taxes, no closing was ever held, and the purchasers never took possession of the property. Hilton paid only 2 years' pasture rent and none of the crop rental owed to the purchasers. The purchasers did not act unfairly or inequitably by failing to pay real estate taxes on property of which Hilton had full use and possession. Similarly, the purchasers did not act unfairly or inequitably by refusing to pay fertilizer expenses for the production of crops when Hilton failed to pay the purchasers for their share of those crops.

If anything, Hilton, through its officers, acted inequitably and unfairly when it failed to extend the abstract of title to the land involved to reflect a mortgage that was more than double the sale price in the 1981 contract. Although Hilton was required to convey clear title except for the Helms' contract, Hilton, through its president, continued to act inequitably and unfairly by having prepared and placed in escrow a deed that conveyed the property to the purchasers "free from encumbrance *except those of record*." Moreover, its officers, by not executing the PCA mortgage in their corporate capacities, created a cloud upon the title to the land involved in the 1981 contract.

## CONCLUSION

We reverse the order of the district court and find that the purchasers' rescission of the 1981 contract was valid; that Hilton's counterclaim for specific performance of the 1981 contract should be dismissed; that the trial court should enter a final, enforceable order for specific performance of the 1976 contract; and that the trial court should determine whether the purchasers are entitled to a monetary award by reason of their rescission of the 1981 contract and whether Hilton is entitled to a setoff or a money judgment against the purchasers by reason of the pasture rent which it paid the purchasers.

This cause is remanded to the district court for further proceedings and entry of judgment consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

WHITE, J., participating on briefs.
SHANAHAN, J., not participating.