SNOWDON FARMS, A NEBRASKA PARTNERSHIP, APPELLANT, V. DALE V. JONES ET AL., APPELLEES.

595 N.W. 2d 270

Filed June 1, 1999.   No. A-98-313.

Kevin T. Lytle, of DeMars, Gordon, Olson & Shively, for appellant.

Douglas J. Stratton, of Stratton & Ptak, P.C., for appellees.

HANNON, SIEVERS, and CARLSON, Judges.

SIEVERS, Judge.

This case is an appeal by Snowdon Farms of a decision by the district court for Knox County entering summary judgment for Dale V. Jones, Ardith A. Jones, Frank E. Jones, and Norma

L. Jones. The Joneses and Snowdon Farms agreed, via a purchase agreement, that the Joneses would sell land to Snowdon Farms. The Joneses ultimately attempted to rescind the agreement. The case involves consideration of a seller's duty to clear title defects.

### FACTUAL BACKGROUND

Snowdon Farms is an informal partnership composed of Kent Snowdon, his wife, his sister, and his brother-in-law. The Joneses are Frank, his brother Dale, and their wives. Snowdon Farms owns land in rural Nebraska on which Snowdon farms and raises livestock. In the 1980's, Snowdon Farms also leased approximately 300 acres of land from the Joneses.

In 1989, Snowdon Farms and the Joneses agreed, via a written purchase agreement, that the Joneses would sell Snowdon Farms the land which Snowdon Farms had been leasing. The land was described in the purchase agreement as "[t]he South Half of the North Half (S½N½) and the North Half of the South Half (N½S½) of Section Thirteen (13), Township Thirty-two (32) North, Range Seven (7) West of the 6th P. M., Knox County, Nebraska, less the following described tracts." The document then describes "Tract 'A'" and "Tract 'B,'" which are portions of the land used for roads.

Snowdon Farms paid $100 down, was to pay $10,000 "at time of execution of the contract," and then was to pay the remaining $47,410 in semiannual installments of $3,885.50, with interest at 9.25 percent annually. Thus, the total sales price, excluding interest, was $57,510.

At the heart of this case is a provision in the purchase agreement which states:

> Seller agrees to furnish within fifteen (15) days from date of the acceptance of this offer a complete abstract of title . . . . *In the event Purchaser's attorney finds defects in said title, Seller, after written notice thereof, shall endeavor to have the same cured* to the satisfaction of Purchaser within a reasonable time after the receipt of notice thereof, *and if not so cured within said time, then either Purchaser or Seller may rescind the agreement,* whereupon Seller shall then refund to Purchaser the

deposit made hereunder. Purchaser agrees to close said purchase within 15 days after delivery of said abstract of title or title commitment, or in the event defects are found in said title within ten (10) days after such defects are cured.

(Emphasis supplied.)

The purchase agreement provided that Snowdon Farms' agreement to purchase was conditioned on the Joneses having "good, valid and marketable title." The purchase contract also stated, "It is understood and agreed that both parties retain their right to bring action for Specific Performance in the event the other party is in default in carrying out his obligations under this contract."

The purchase agreement is dated July 11, 1989. There is no indication exactly when the partners of Snowdon Farms signed the agreement, but their signatures all appear at the bottom. On August 18, Dale and his wife accepted Snowdon Farms' offer by signing the purchase agreement. However, there were problems with the title. The land was encumbered by judgments that the Federal Deposit Insurance Corporation (FDIC) had secured against Frank in 1984, as well as a mortgage on the land that a man named "Larry Lee Nielsen" had given to the Bank of Niobrara.

Nielsen bought the land from the Joneses on an installment contract in 1981. In 1983, Nielsen gave a real estate mortgage for $221,000 to the Bank of Niobrara, and the mortgage included the land at issue. The Bank of Niobrara later failed, and the FDIC took over debts due the bank, including Nielsen's. On April 29, 1985, in a case brought by the FDIC against Nielsen, the district court for Knox County ordered that Nielsen pay various outstanding obligations or the land would be sold and the proceeds used to pay off the FDIC, Knox County for real estate taxes, and the Joneses for the balance due under the installment contract. On May 2, 1985, Nielsen deeded the land back to the Joneses via a quitclaim deed for "One Dollar & other valuable consideration." The deed is exhibit 17 in Frank's deposition. Attorney Dale Riesberg notarized the deed, and the deed was filed December 24, 1985.

In a deposition taken July 24, 1997, Frank testified that at the time Nielsen deeded the land back to the Joneses, neither Frank nor Dale knew about Nielsen's having mortgaged the land. Also, Frank testified that they did not know about the FDIC's trying to have the land sold by the sheriff to satisfy its lien. On August 27, 1986, the district court for Knox County entered an "Order of Sale" which decreed that the land be sold because Nielsen had not paid his debts. This did not happen, but the record does not reveal why. Nielsen apparently filed for bankruptcy in 1987, but died at some point between the bankruptcy and the inception of this case.

Riesberg, the Joneses' attorney during much of the time at issue in this case, obtained a title insurance commitment for the sale to Snowdon Farms, with an effective date of October 23, 1989. The "Requirements" portion of the policy mandated that Nielsen's mortgage be released; that taxes for 1988 of $904 be paid; that the land be released from judgments obtained by the FDIC against Frank in the respective amounts of $35,000 and $66,000; and that the deed be executed by Dale, Frank, and their wives, conveying it to "Snowdon Farms, a Nebraska partnership."

The record does not establish when Snowdon Farms learned of the title defects or how. However, it appears that both parties knew of the defects early on and knew that the Joneses were responsible for curing them. There is no dispute on this issue in the parties' briefs, and there are no facts in the record indicating anything to the contrary.

Riesberg testified at his deposition, taken July 24, 1997, to his efforts at curing the title problems. Snowdon Farms summarizes those efforts in its brief to this court. The Joneses, in their brief, accept this summary of Riesberg's efforts as accurate. Snowdon Farms' summary lists Riesberg's defect-curing activities as follows:

    1. 2/12/91 Telephone conference with Chris Gazulos of FDIC;

    2. 2/15/91 Telephone conference with Chris Gazulos;

    3. 2/3/93 Letter to Anthony Burke of FDIC (follow-up to earlier phone conversation);

4. 3/15/93 Telephone conversation with Jay Bailey of FDIC;

5. 4/14/93 Phone inquiry from FDIC;

6. 4/21/93 Telephone conference with Jay Bailey;

7. 4/21/93 Telephone conference with Mary of FDIC;

8. 5/10/93 Letter to Mike Rogers of FDIC;

9. 1/20/95 Telephone conference with Patricia Potter of FDIC;

10. 2/10/95 Letter to Patricia Potter;

11. 4/12/95 Telephone conference with Patricia Potter;

12. 5/3/95 Telephone conference with Patricia Potter, who suggested payment as curative option;

13. 2/6/97 Attempt to contact Nurudeem Borishade of FDIC;

14. 2/17/97 Telephone conference with Ken Shorter and perhaps also Jeff Jufrida of FDIC;

15. 3/13/97 Attempt to contact Nurudeem Borishade;

16. 6/16/97 Letter to FDIC.

Brief for appellant at 14-15.

Riesberg testified that he never filed any legal action to free the land from the Nielsen lien. Riesberg did not testify with great specificity about what he did to cure the defects, and clearly, considerable intervals passed between activities. In describing the above-listed contacts, Riesberg gave explanations for some of them, such as FDIC personnel requesting the name of the bank that held the mortgage and "talk[ing] about some options that might be available including payment." A bit later in the deposition, Snowdon Farms' attorney asked Riesberg about a letter Riesberg wrote to Snowdon, explaining his efforts to clear title. We quote part of the exchange:

Q Showing you Exhibit 15, is that an example of the letter that you may have sent to Kent Snowdon or to Snowdon Farms discussing at least in part your efforts to clear title to this property?

A This is a letter dated February 22nd, 1992, and I had penciled a note on the bottom of that advising Kent Snowdon that I'm having difficulty getting FDIC to return my calls and that I leave a message and that I get no call back.

There was also the following exchange between Snowdon Farms' attorney and Riesberg:

Q Now, did you on behalf of the Jones' go to FDIC and say we've got a contract for sale of this property, if we pay you Frank's half, will you release the mortgages— or judgments, I should say release the judgment liens?

A We attempted— I attempted to contact FDIC on a number of occasions, I don't know whether it was with that specific offer that you suggest, but just contacting them in an attempt to clear the title to the real estate.

Q With regard to Larry Lee Nielsen, the FDIC, of course, had its second mortgage that was listed as a requirement in Paragraph 2 of Exhibit 26.

A That's correct.

Q Do you know how much Larry Lee Nielsen owed the Jones' at the time he executed that quitclaim deed?

A Exactly at this point, no, I don't.

Frank testified during his deposition that he did not personally make any efforts to cure the defects, nor did he request Riesberg to do so. Rather, Frank testified that Riesberg acted of his own volition. Snowdon testified during his deposition that he contacted Riesberg several times a year to check on progress in curing the title defects and to see whether he could help. He took no action on his own. Throughout the years of delay, Snowdon Farms continued to lease the land, executing a lease every year. Snowdon testified that he thought his lease payments were being applied to the purchase of the land.

It is undisputed that by some point in 1995, the FDIC's judgments against Frank lapsed of their own accord, so that thereafter the only remaining title defect was the one stemming from Nielsen's mortgage.

In January 1997, Riesberg obtained another title insurance commitment. A copy of this policy was received in evidence as exhibit 2 at the hearing on summary judgment. The "Requirements" section of this policy lists the chronology of events regarding Nielsen's mortgage and related issues, which we summarized earlier. The policy then states that with regard to the Nielsen lien, "We will need a Release from FDIC." There is no mention of the FDIC's judgments against Frank. Frank testified

that he did not ask Riesberg to obtain this second title insurance commitment and that Riesberg had done so on his own.

Snowdon testified that "in the first part of January, [Riesberg] said that they were getting close to getting this all squared away," because Frank's problems with the FDIC were solved when the FDIC's liens lapsed. Riesberg wrote a letter to Snowdon, dated February 13, 1997, which is included in our record, in which he states that he will "once again be contacting FDIC on this matter" of the title defect. As noted in the summary of Riesberg's contacts with the FDIC, there were at least three contacts or attempted contacts between Riesberg and the FDIC following the February 13 letter to Snowdon.

### DIRT "MUDDIES THE WATERS"

Sometime before May 1997, the K. Porter Construction Company (Porter Construction) and the Joneses talked about Porter Construction's buying dirt from the Joneses' land to be used in building a bridge over "the Mormon Canal." The Joneses were interested. In early May, Frank contacted Snowdon to see if, in Snowdon's words, Snowdon "would be willing to give them two point some acres of land and this dirt work be done and stuff." Snowdon testified that he was not sure what to do, and he told Frank he would get back to him.

Snowdon then went to talk with Riesberg. According to Snowdon, Riesberg told him that he might be entitled to half of the money from the dirt deal. Riesberg also allegedly said that he needed to talk with Frank some more. Snowdon testified that he and Riesberg set up another date on which to meet, probably May 27, 1997.

Snowdon talked with Frank again and told Frank what Riesberg had allegedly told him about being entitled to one-half of the dirt money. The Joneses apparently put in a bid for the dirt deal during bidding held on May 22, 1997. They were evidently victorious. Exhibit 24 is the agreement between the Joneses and Porter Construction. By its terms, Porter Construction was to pay the Joneses 50 cents per cubic yard of dirt, and the estimated amount of dirt to be removed was 104,000 cubic yards.

On May 27, 1997, the day Snowdon was supposed to meet with Riesberg, he received a letter dated May 26, 1997, from the

Joneses. It is addressed to the four people composing Snowdon Farms and is labeled, "Re: Purchase Agreement of Jones Farm dated 7/11/89." It states: "Please be advised that the undersigned have determined the above referenced Purchase Agreement to be null and void and by copy of this letter we are requesting Atty. Dale Riesb[e]rg to refund to Snowdon Farms the $100. initially paid to Atty. Dale Riesb[e]rg." The letter is signed by all four Joneses. Snowdon testified that in response to the written notice, he tried to call Riesberg "two weeks every day and he would not talk to me." Additionally, he testified that a day or two after receiving the "null and void" notice, he approached Dale and then Frank, asking what had happened. Snowdon said that he "kind of begged" Frank not to rescind, but to no avail.

According to Snowdon, Porter Construction began excavating dirt from some of the land, and the Joneses fenced off another piece of the land for pasture. Further, the Joneses allegedly began tearing down a house located on the land. All of this purportedly happened without Snowdon's approval, though the price of his lease was adjusted accordingly. Snowdon estimated that 30 of the approximately 300 acres were taken up by the dirt harvesting, pasture, and house destruction activities.

Frank was asked during his deposition why there was such a long delay between the signing of the purchase agreement in the summer of 1989 and the second title commitment in January 1997. Frank said, "This is as near as I can understand it, that it's Larry Lee Nielsen's bankruptcy is holding it up." Frank also acknowledged that the FDIC's judgments against him had complicated matters. When asked why he and the other Joneses sent Snowdon Farms the "null and void" notice, he responded, "Because of [the purchase agreement's] age." However, Frank was questioned further. We quote excerpts from the exchange between Snowdon Farms' attorney and Frank on this point:

Q What had happened between January 23rd of 1997 when Exhibit 2, the title commitment, was given and May 26, 1997 to cause you to give the notice you gave on May 26, 1997?

A Kent came to me and said Dale Riesberg told him he might be entitled to half the dirt because of the purchase

agreement. And we decided that couldn't be so. We did, right here. (Indicating)

Q We being you and Dale and your wives?

A Yes.

Q Decided that it couldn't be so that the Snowdons or Kent Snowdon would get half of the dirt money?

A I don't know.

Q I'm just trying to understand your answer, make sure that I understand you. You said that Kent came to you between January 23rd of 1997 and the date of this document and said I think I might be entitled to half of the dirt money.

A Yes.

. . . .

Q Okay. You and Dale Jones talk over Kent saying I think I should get half of the money or half of the dirt money or I might be entitled to half of the dirt money. Did you and Dale Jones, your brother, decide that the agreement was null and void because you didn't want to give Kent half of the dirt money?

A Yes.

. . . .

Q Okay. Is there anything else that happened between January 23rd, 1997 when the title commitment was issued and May 26th, 1997 that caused you and Dale to say that the agreement was null and void?

A No.

## PROCEDURAL BACKGROUND

On June 17, 1997, Snowdon Farms filed a petition for specific performance. The petition alleges, in substance, that Snowdon Farms made an offer; the Joneses accepted; closing was delayed because of defects in the title for which the Joneses were responsible; Snowdon Farms had performed all conditions required of it and was ready to finish the deal; and, finally, the Joneses' letter claimed that the purchase agreement was null and void. The Joneses filed an answer generally denying all of Snowdon Farms' allegations and asserting, "Said re[s]cision occurred as a result of Jones sending notice of re[s]cision, on May 26, 1997, directly to Plaintiff and furthermore requesting

Dale Riesberg to refund the Snowdon Farms' $100.00 deposit." The answer then states, "There remains to be nothing left to complete, pursuant to the terms in the purchase agreement, and there is nothing left for the Court to order specific performance upon."

Snowdon Farms filed a reply on September 24, 1997, denying all the substantive portions of the Joneses' answer and specifically responding to the answer by stating that the "Joneses never tendered the $100 down payment back until September 16, 1997, which tender was refused[.]" The reply also alleges a raft of new material, some factual and some containing conclusions and argument. For example, there is an entire section entitled "The Dirt," which concludes with the assertion that the dirt money is Snowdon Farms' or represents a credit against the purchase price in the contract.

On October 8, 1997, Snowdon Farms filed a motion for summary judgment. An affidavit of Snowdon was attached to the motion. Snowdon, among other things, states in the affidavit, "If approved by this court, Snowdon Farms will pay the remaining balance due on the purchase agreement after the dirt credits to the defendants Joneses within 30 days of any decree herein." The affidavit also states that Snowdon Farms will waive the title commitment requirement that FDIC release the Nielsen/Bank of Niobrara mortgage.

On the same day that Snowdon Farms filed its motion for summary judgment, a "Motion" was filed which asked that the district court enter an order satisfying and releasing the mortgage of the FDIC, as successor to the Bank of Niobrara on the property involved in this case. The motion alleges that Snowdon Farms has a purchase agreement for the fair market value of the land, that Snowdon Farms has "waited to complete this purchase agreement for seven years," and that Riesberg "has told Snowdon Farms that he just cannot get FDIC to respond to his letters or calls or anything." We note that the FDIC is not a party to this case.

On October 23, 1997, the Joneses filed their own motion for summary judgment. At the hearing on both motions for summary judgment, exhibits were offered, including the affidavit of Riesberg, which admits that September 16, 1997, was the first

time he attempted to refund the $100 deposit. The trial judge summarized the position of the Joneses: "All right. You are saying there is a defect in the title. You have rescinded and any efforts plaintiff takes to cure the defect is of no effect because you said this is over." The Joneses' attorney responded, "That's correct."

Snowdon Farms offered 29 exhibits in support of its motion and in opposition to the Joneses'. These exhibits included legal documents such as the purchase agreement and leases for the land, copies of judgments, correspondence, three depositions, an affidavit, and a map of the land. The Joneses offered three exhibits in support of their motion and in opposition to Snowdon Farms' motion: Riesberg's affidavit, Snowdon Farms' petition, and the Joneses' answer.

On December 8, 1997, the FDIC filed a disclaimer in the district court, "hereby disclaim[ing] any right, title, and interest in and to the property which is the subject matter of this action." On January 8, 1998, the district court entered a "Journal Entry" stating that Nielsen's mortgage and its foreclosure by the FDIC were "satisfied, canceled, and released of record."

Thereafter, on January 13, 1998, the district court granted the Joneses' motion for summary judgment. The district court stated, "A request [in 1989] for title insurance revealed that defendants did not have marketable title to the subject property." The order then quotes that portion of the purchase agreement which conditions the purchaser's offer to purchase on the owner having good, valid, and marketable title, and on the owner agreeing to convey the property free and clear of all liens, encumbrances, and special taxes. The order also quotes the portion of the purchase agreement regarding the seller endeavoring to have any defects cured within a reasonable time. Also, the district court cites a portion of Snowdon's deposition testimony in which he stated that he would not accept the property in its encumbered state. Later in the order, the district court states,

> In the instant case, defects in marketable title were noted in 1989. As late as August, 1997, plaintiff was not willing to waive those defects. The contract of the parties gave the defendants the option of rescission if title defects were not cured within a reasonable time. The Court finds as a mat-

ter of law that a reasonable time had passed when defendants gave their notice of rescission dated May 26, 1997, some 7 years 10 months after entering into the purchase agreement. Defendants had a legally sufficient ground for rescission.

The court then rejected Snowdon Farms' argument that rescission was not complete because its $100 deposit was not timely refunded on the ground that tender had been refused and was, in any event, a futile act.

On January 16, 1998, Snowdon Farms filed a motion for new trial, with several documents attached, including an affidavit of Snowdon Farms' attorney asserting, among other things, newly discovered evidence. The showing was that Snowdon Farms' attorney took it upon himself to learn about the Nielsen mortgage and foreclosure, made inquiries, and by January 5, 1998, had succeeded in having any encumbrance removed from the property. There is no record of any hearing held on the motion for new trial. The district court entered an order on March 9, 1998, overruling the motion without comment. Snowdon Farms timely appealed to this court.

## ASSIGNMENTS OF ERROR

Snowdon Farms assigns 10 errors. Restated, they are that the district court erred by (1) sustaining the Joneses' motion for summary judgment and basing that decision on findings that there was a legally sufficient ground for rescission; (2) failing to sustain Snowdon Farms' motion for summary judgment and to order the Joneses to specifically perform, given that the Joneses did not endeavor to cure title and thus lost any right to rescind; (3) failing to find material issues of fact in the questions of whether the Joneses endeavored to clear title and whether the Joneses' purported rescission was an attempt to avoid a bad bargain; and (4) failing to sustain Snowdon Farms' motion for new trial.

## STANDARD OF REVIEW

■ In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence.

*Deprez v. Continental Western Ins. Co.*, 255 Neb. 381, 584 N.W.2d 805 (1998).

An action for specific performance sounds in equity, and on appeal, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent from the conclusion reached by the trial court. *Marten v. Staab*, 249 Neb. 299, 543 N.W.2d 436 (1996).

## ANALYSIS
*Defects in Title and Seller's Duty to Cure.*

Although not discussed by the district court, we think the seller's duty to cure defects of title is the key issue. There is surprisingly little case law in Nebraska, or elsewhere, detailing what a seller must do in trying to cure defects in title. Perhaps this is because sellers generally want to cure defects in order to complete the deal they made. It appears that most litigation in this area involves a buyer, rather than a seller as we have here, seeking to avoid a contract of sale. Indeed, one case from another jurisdiction states that rescission generally is for buyers only, and sellers are not entitled to it. *Kelley v. Leucadia Financial Corp.*, 846 P.2d 1238 (Utah 1992). In this case, of course, the parties expressly provided for rescission by either party, depending upon certain conditions which will be discussed in depth later.

In any event, we begin our analysis with a treatise which briefly discusses this subject, stating, "[T]he seller's responsibility to deliver marketable title is due at the time of closing and not before. Even if title is defective prior to that time, seller normally is entitled to have a reasonable opportunity of fixing title so it becomes marketable." 14 Richard R. Powell, Powell on Real Property § 881[6][f] at 81-181-82 (1999).

Regarding the purchaser's duty to inform the seller of title defects, 14 Powell, *supra* at 81-182, states, "Purchaser is freed from the obligation of notifying seller of alleged defects and giving seller a reasonable time to cure them if these acts would be futile under the circumstances." While the characterization of "futile" does not apply to curing the defects involved in this case, as we shall discuss later, it was futile or unnecessary for

Snowdon Farms to notify the Joneses about the title problems. The Joneses found out about the defects on their own. Thus, failure by Snowdon Farms to formally notify the Joneses of title defects is not a fact of consequence.

Professor Milton R. Friedman in Contracts and Conveyances of Real Property (4th ed. 1984) briefly addresses the issue of what a seller must do to cure defects. Professor Friedman gives a specific example of disclaiming language a seller could put into a contract so that he or she would not be required to attempt to cure defects. Professor Friedman then states,

> In the absence of any such language the seller would be under some obligation to this effect. In at least one case it has been held that a seller is not "unable" to convey when a little effort and expense will cure the title and that it is the seller's obligation to go to such trouble and expense. [Citing *Mokar Properties Corp. v. Hall*, 6 A.D.2d 536, 179 N.Y.S.2d 814 (1st Dep't 1958).]

Friedman, *supra*, § 1.2(g) at 26. Professor Friedman also states, "A buyer is entitled to the kind of title stipulated for in the contract of sale." *Id.*, § 4.2 at 318.

In yet another treatise, 11 Thompson on Real Property § 91.09(a)(6) (David A. Thomas ed. 1994), the authors discuss rescission. In discussing when a purchaser may rescind a land sale contract, the author notes: "In order to rescind a contract because of defects in a title, the party must act promptly and within a reasonable time." *Id.* at 62. On the other side of the contract, a seller who has agreed to cure title defects must make reasonable attempts to do so, in order for the contract to be meaningful.

*Fritsch v. Hilton Land & Cattle Co.*, 245 Neb. 469, 513 N.W.2d 534 (1994), sheds some light on the duty of a seller to cure title defects. John H. Fritsch (Fritsch) and Josephine M. Fritsch sold land to the Hilton Land & Cattle Company (Hilton) in 1976. Hilton mortgaged the land in 1978. In 1981, Hilton sold some of the land back to Fritsch. Fritsch's attorney testified that Ken Hilton, president of Hilton, claimed that title to the land was free and clear.

The 1981 contract provided that if an abstract of title showed defects to which Fritsch did not consent, Hilton " *'shall have a*

*reasonable time in which to remedy and/or remove any such title defects. . . .'*" (Emphasis in original.) 245 Neb. at 478, 513 N.W.2d at 541. The contract further provided that if Hilton did not remedy the defects, Fritsch could either take the land as it was or rescind the contract. The contract listed a closing date of December 24, 1981.

Closing did not occur in December 1981, for reasons not made clear in the opinion. In 1982, Fritsch found out about the mortgage and requested another abstract from Hilton. Hilton provided one, but it did not show the 1978 mortgage. Fritsch then obtained, through his own attorney, a supplemental abstract which did show the 1978 mortgage. In 1984 and 1985, the parties tried to negotiate a settlement, and Hilton apparently began an attempt to clear up the title problem created by the mortgage. In April 1985, Fritsch wrote a letter to Hilton, suggesting that rescission was appropriate, which he followed by filing suit for rescission.

After a trial, the district court denied Fritsch's request for rescission and instead granted Hilton's counterclaim for specific performance. The district court found that Fritsch had accepted benefits under the contract and had participated in extending the time in which to cure the defect.

On appeal, the Nebraska Supreme Court reversed the district court's decision, holding that Fritsch was entitled to rescission. The Supreme Court held that Hilton knew about the mortgage-related defect when it made the deal in 1981, yet failed to do anything about it until 1984, and then only at Fritsch's behest. In short, Hilton failed to cure the defect within a reasonable time, and as the seller, Hilton could no longer insist on performance by Fritsch.

The *Fritsch* court relied on several propositions of law that are relevant to this case. First, the court stated that the unambiguous terms of a contract govern the rights and duties of the parties and that the words of a contract must be given their plain and ordinary meaning.

On the issue of time, the court stated, "What constitutes a reasonable time for the performance of a contract must be determined from the general nature and circumstances of each case." *Fritsch v. Hilton Land & Cattle Co.*, 245 Neb. 469, 478,

513 N.W.2d 534, 542 (1994). Regarding rescission, the court stated, "In determining whether a rescission took place, courts look not only to the language of the parties but to all the circumstances." *Id.* at 480, 513 N.W.2d at 542.

Clearly, there are some important factual differences between the *Fritsch* case and this case. In *Fritsch*, the contract only expressly gave the buyer the option of rescinding the agreement in the event that defects were not cured. Also, the buyer sought to rescind, while in our case, it is the seller who now wants out. Further, in *Fritsch*, there was a definite closing date. However, the cases are similar enough that some useful principles may be gleaned from *Fritsch* and applied to this case. First and foremost is a tacit acknowledgment by the Nebraska Supreme Court that the seller has some measure of duty to cure defects in title when a purchase agreement provides that the seller shall convey good title, but nonetheless provides the seller with a reasonable amount of time in which to cure any defects. *Fritsch* also discusses delays in performance while title defects remain uncured, and the analysis of the significance of such delay is tied to whether the party seeking to use the delay to avoid the contract has been prejudiced.

■ Third, implicit in the *Fritsch* analysis is the notion that determining what is a reasonable time to cure title defects as well as whether rescission is proper is, to a large degree, significantly affected by the nature of the defects. In other words: What is the defect? Can it be cured within a reasonable time, if at all? And what is needed to cure the defect? *Fritsch* indicates that entitlement to rescission is judged by "all the circumstances," 245 Neb. at 480, 513 N.W.2d at 542, and that determining what constitutes a reasonable time is dependent on the "circumstances of each case," *id.* at 478, 513 N.W.2d at 542. Finally, *Fritsch* also makes it clear that the right to rescind a contract can be waived.

■ Applying the foregoing principles to the present case, we first note that the purchase agreement required that in the event of title defects, the Joneses shall "endeavor to have the same cured to the satisfaction of Purchaser within a reasonable time." If not cured, either the purchaser or seller could rescind. This language is plain and unambiguous, but we must give meaning

to the contract as a whole, including the language where the seller agreed to "endeavor" to cure defects. Consequently, the Joneses must take some affirmative steps to cure defects in order to convey the land to Snowdon Farms by "good, valid and marketable title," as they agreed to do in the original purchase agreement. We hold that a seller's endeavor to cure title defects must be reasonable under the circumstances and undertaken in good faith with the goal that the defects be cured. To the same effect are decisions from other jurisdictions. See, *Kelley v. Leucadia Financial Corp.*, 846 P.2d 1238, 1243 (Utah 1992) ("[g]enerally, when a seller agrees to convey marketable title, the seller must undertake to cure defects if it can be done in the exercise of reasonable diligence and within a reasonable time"); *Ace Realty, Inc. v. Looney*, 531 P.2d 1377, 1380 (Okla. 1975) (seller of land defaults on land sale contract by virtue of "the purchaser's tender of performance and a demand for merchantable title where the defective title could be cleared without difficulty in a reasonable time"). To hold otherwise would make the Joneses' obligation to "endeavor to cure" meaningless and render any similar purchase contract largely voidable at the seller's whim, should a defect of title be found. Our holding in this regard is perhaps nothing more than the logical extension of the rule that inconvenience or cost of compliance with a contract, though such may make compliance a hardship, cannot excuse a party from the performance of an absolute and unqualified undertaking to do a thing that is lawful and possible. *Mohrlang v. Draper*, 219 Neb. 630, 365 N.W.2d 443 (1985) (suit for specific performance against vendor of lot by purchaser).

The district court found that a reasonable amount of time had elapsed, that Snowdon Farms refused to take the land in its encumbered state, and that the Joneses had "a legally sufficient ground for re[s]cission." We presume the "sufficient ground" cited by the district court is that a lot of time had passed while title defects remained uncured. But determination of the matter based solely on the passage of time without consideration of whether the seller has fulfilled its duty to endeavor to cure defects is an incomplete analysis. To fully analyze this matter, there are additional important circumstances to be considered, including the nature of the defects involved, whether they are

curable, what is needed to cure the defects, the extent to which the parties demonstrated concern about the passage of time, whether there had been a waiver of time requirements, and the motive behind the attempted rescission. Part of the reason that a complete analysis requires examination of such matters is that our law is clear that specific performance should generally be granted as a matter of right when there is a binding contract for the sale of real estate which is definite and certain in its terms, material in its obligations, and free from overreaching, fraud, or unfairness, and the remedy at law is inadequate. *Mohrlang, supra.* In short, Snowdon Farms, as the purchaser of the land, begins with nearly a presumption of entitlement to specific performance, which was not accorded sufficient deference by the district court.

Turning to these additional factors, we see no consideration in the district court's order of the Joneses' motive for attempting to rescind. In this regard, we recall Frank's deposition testimony where he essentially admits that the motive for the rescission was to hinder Snowdon's effort to get some of the dirt money. When the evidence is construed most favorably to Snowdon Farms, as must be done on a motion for summary judgment, the conclusion is inescapable that the Joneses attempted to rescind because of the "dirt money," not because too much time had elapsed.

Viewing the evidence most favorably to Snowdon Farms, we find it is clear that prior to the dirt deal, the Joneses were totally unconcerned with the passage of time. Additionally, because the Joneses provided a second title commitment, we must conclude that the record clearly contains evidence of a waiver by the Joneses of any right to rescind based on the passage of time, at least from the date of contracting, July 11, 1989, to the time of the second title insurance commitment in January 1997. *Fritsch v. Hilton Land & Cattle Co.*, 245 Neb. 469, 513 N.W.2d 534 (1994), defines waiver in this context as a voluntary and intentional relinquishment of a known right which may be demonstrated by or inferred from a person's conduct.

Thus, the district court's decision and rationale also fails to account for this evidence of waiver, which must be considered in conjunction with the fact that it was the Joneses' duty to act

to cure defects—not Snowdon Farms'. Furthermore, the title defects did not become more difficult to cure during the years that the sale was pending—in fact, they became simpler, albeit through no effort of the Joneses. The fact is that the FDIC judgments against Frank simply lapsed. Thus, the passage of time, rather than creating problems for the parties, served to eliminate all title problems but the FDIC/Nielsen mortgage. This is an apt point in our analysis to recall the wisdom of the *Fritsch* holding that a reasonable time for performance must be determined from "the general nature and circumstances of each case." 245 Neb. at 478, 513 N.W.2d at 542. We hasten to repeat that whether a seller has properly, but unsuccessfully, "endeavored" to cure defects, so as to enable the seller to rescind, is likewise a matter judged by the "general nature and circumstances of each case." However, hardship which equitably excuses specific performance may be a circumstance unforeseeable at entry into the contract, it cannot be self-inflicted or caused through inexcusable neglect of the person seeking to be exonerated from specific performance. *Mohrlang v. Draper*, 219 Neb. 630, 365 N.W.2d 443 (1985).

Clearly, when the Joneses' attorney obtained and delivered to Snowdon Farms the second title insurance policy in January 1997, a reasonable buyer could reasonably conclude that the deal was still on. Frank testified that Riesberg did this on his own and not at the Joneses' request. However, all concerned knew that Riesberg represented the Joneses, and by the time the second title insurance policy was issued in 1997, Riesberg had already performed title-related work for the Joneses on the deal. Riesberg clearly appears to have been Snowdon's main contact person about the contract. Legally, Riesberg was the Joneses' agent, and they were bound by his acts. *VRT, Inc. v. Dutton-Lainson Co.*, 247 Neb. 845, 850-51, 530 N.W.2d 619, 623 (1995) ("omissions and commissions of an attorney are to be regarded as the acts of the client whom the attorney represents[.] . . . Moreover, a principal holding out an agent as having authority to represent the principal and thereby asserting or impliedly admitting that the agent is worthy of trust and confidence is bound by all the agent's acts within the apparent scope of the employment"). Thus, when deciding the motion for summary

judgment, the district court should have considered the evidence of a waiver by the Joneses of their right to rescind based on the passage of time from July 11, 1989, when the contract was made, until January 1997, when the Joneses provided the second title insurance policy which evidenced that the contract was still operative.

■ A seller who contracts to deliver good title and as part of that contract agrees to endeavor to cure title defects, within a reasonable time, has a duty to make reasonable efforts to cure any defects. While the rule seems to be little more than common sense, it also is distilled from *Fritsch, Mohrlang*, and the treatises and cases from other jurisdictions cited earlier. Also, any other rule would make contracts for the sale of real estate voidable upon the whim of the seller, regardless of whether the whim is motivated by a dirt deal, a buyer with more money, or seller's remorse. The terms of the purchase agreement in this case unambiguously required that the Joneses endeavor to cure title defects, and that was their duty. See, *Fritsch v. Hilton Land & Cattle Co.*, 245 Neb. 469, 513 N.W.2d 534 (1994); *McDonald's Corp. v. Goler*, 251 Neb. 934, 560 N.W.2d 458 (1997). Exactly what a seller must do to fulfill that duty is, of necessity, determined by the facts and circumstances of each case, which involves mainly an examination of the nature of the title problems and what would be required to cure them. As suggested by *Mohrlang*, the district court should have examined whether the failure to clear title was because of the Joneses' inexcusable neglect.

The Joneses, as the movants for summary judgment, had the burden to show that no genuine issue of material fact existed. See *Deprez v. Continental Western Ins. Co.*, 255 Neb. 381, 584 N.W.2d 805 (1998). Included within the important and material factual issues is whether they fulfilled their contractual duty to endeavor to cure title, which is a condition precedent to their ability to rescind. See *O'Brien v. Fricke*, 148 Neb. 369, 27 N.W.2d 403 (1947) (holding that condition precedent is condition which must be fulfilled before duty to perform contract arises and that party who pleads conditions precedent has burden of proving that they have been satisfied). See, also, *Ace Realty, Inc. v. Looney*, 531 P.2d 1377, 1380 (Okla. 1975) ("[a]

party to a contract for the sale of real estate who asks for re[s]cission must himself be without fault"). Applying this concept to the present case, the condition precedent to the Joneses' ability to rescind is that they have reasonably endeavored in good faith to clear title defects. In this case, the Joneses do not even plead in their answer that they have endeavored to clear title. Instead, they simply alleged that no clear title could be passed within a reasonable amount of time, an allegation which is rather empty unless there is also an allegation (and ultimately proof) that they unsuccessfully endeavored to clear title defects as they were contractually bound to do.

We return to the evidence on this issue, which must be viewed most favorably to Snowdon Farms. Riesberg testified to some telephone and letter contacts with the FDIC to clear the title. But there is little evidence about the specifics of his efforts. The evidence of the nature, extent, and results of the contacts is so sparse that we cannot say that the Joneses, who had the burden of proof on this issue, established as a matter of law that their efforts to cure the defects were reasonable under the circumstances, particularly given the preference for specific performance found in property law. See *Mohrlang v. Draper*, 219 Neb. 630, 365 N.W.2d 443 (1985). The record fails to establish as a matter of law that the Joneses fulfilled their contractual duty to endeavor to cure title defects. Thus, the granting of summary judgment to the Joneses was error.

## MOTION FOR NEW TRIAL

There was evidence offered in support of the motion for new trial that an attorney for Snowdon Farms cleared the title of the FDIC/Nielsen defect in under a year, even though the burden of doing so was the Joneses. In fact, the trial court decided that the FDIC/Nielsen problem was solved. On January 8, 1998, the district court entered a journal entry which "satisfied, canceled, and released" the FDIC/Nielsen mortgage, which was the only remaining title problem of consequence.

This journal entry of January 8, 1998, was made before the district court entered its order granting summary judgment for the Joneses, which allowed them to rescind the contract. Thus, the district court's orders are inherently inconsistent. The order on

summary judgment does not mention the fact that the title was clear of the FDIC/Nielsen defect by the time the order granting summary judgment was entered. Because the record made on the motion for new trial conclusively shows that the main defect was "curable," and cured by the court's own journal entry, the district court, given the law's preference for specific performance, should have sustained the motion for new trial. Thus, this assignment of error is also well taken.

## CONCLUSION

While Snowdon Farms moved for summary judgment, it does not assign as error the district court's failure to enter summary judgment granting it specific performance. When each party has moved for summary judgment and one motion is denied and the other granted, the appellate court obtains jurisdiction of both motions and may determine the controversy which is the subject of those motions, making an order specifying the facts which appear without substantial controversy and directing such proceedings as it deems just. *Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993).

Thus, we find that the district court erred in granting summary judgment to the Joneses and that the court should have found that they were not entitled to rescind the contract. Because the district court's own January 8, 1998, journal entry cleared and cured the FDIC/Nielsen defect on the title, it is only fair and just that the district court reconsider Snowdon Farms' motion for summary judgment in light of that fact and in view of the law of specific performance cited herein. In other words, Snowdon Farms shall have a new trial on its motion for summary judgment. We remand the cause to the district court for that purpose.

REVERSED AND REMANDED WITH DIRECTIONS.