IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

LEWIS V. GOSLIN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CORY LEWIS AND ELISABETH N. LEWIS, HUSBAND AND WIFE, APPELLANTS,

V.

MICK D. GOSLIN AND BETH L. HERSH-GOSLIN, HUSBAND AND WIFE, APPELLEES.

Filed March 21, 2023.    No. A-22-131.

Appeal from the District Court for Washington County: JOHN E. SAMSON, Judge. Affirmed.

John P. Farrell and Daniel L. Rock, of Ellick, Jones, Buelt, Blazek, & Longo, for appellants.

James B. McVay, of Tiedeman, Lynch, Kampfe, McVay & Respeliers, for appellees.

MOORE and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Cory Lewis and Elisabeth N. Lewis (the Lewises) appeal from the order of the district court for Washington County that dismissed their claims and granted declaratory judgment in favor of Mick D. Goslin and Beth L. Hersh-Goslin (the Goslins). The Lewises entered into a purchase agreement with the Goslins for the sale of their property in September 2013. However, closing had not yet occurred when this suit was initiated in February 2019. The district court found that the Goslins were entitled to specific performance and closing occurred following various posttrial delays. The Goslins argue because that because the Lewises had transferred all right, title, and interest in the property to the Goslins in April 2022, the Lewises' appeal is moot. We decline to find the appeal moot, and for the reasons that follow, we affirm the judgment of the district court.

- 1 -

## II. STATEMENT OF FACTS

### 1. PURCHASE AGREEMENT AND PROCEDURAL HISTORY

This case involves approximately 11.4 acres of residential property in rural Washington County, originally owned by the Lewises. The property includes a home, barn, several outbuildings, woods, and a pond. On May 22, 2013, the Lewises entered into a purchase agreement to sell approximately 9.27 acres of the property to their neighbors, Timothy Welsh and Kathy Stevens-Welsh (the Welshes), at a price of $9,325 per acre. The Welshes paid a $1,000 deposit that same day, but a closing date was not included in the agreement.

After the land was surveyed, the Lewises and Welshes executed an addendum to the original purchase agreement on July 27, 2013. The addendum reduced the tract size to 8.4 acres and stated that the total purchase price was $78,330; $1,000 of which was already deposited on May 22, leaving a balance of $77,330. The closing date was to take place "upon sale of Seller's existing home situated on the [remaining] 3 acre tract. . . or at such earlier date as is acceptable to Seller." On August 23, the Welshes recorded a "notice of interest in real estate" with the Washington County Register of Deeds. The Lewises pursued a "lot split," intending to sell the 8.4 acres to the Welshes and the remaining 3 acres and house and to the Goslins. The lot split was never approved.

On September 11, 2013, Cory Lewis and the Goslins signed a handwritten letter of intent which referenced the Lewises' desire for the Goslins to purchase a 3 acre tract of their land and the Goslins' payment of $1,000 as a deposit. On October 1, the Lewises and Goslins signed a purchase agreement which states that the tract of land sold to the Goslins would "contain at least 4.0 +_ acres." The purchase price was to be $95,000 for the first 3 acres, plus $10,000 per acre purchased in excess of 3 acres. At closing, the Goslins would pay $39,000 and the cost of any additional acres, and the Lewises would finance $55,000 at the interest rate of 4.5% per annum.

The purchase agreement also contemplated that if the Welshes reneged on their agreement to purchase the 8.4 acres, then the Goslins would purchase the entire 11.4 acres. The purchase price for the entire property would be $95,000, plus the purchase price contained in the Welshes' purchase agreement and addendum. The purchase agreement noted that if the Goslins purchased the entire parcel of land, "the amount to be paid at the time of closing and the amount to be financed [by the Lewises]" would be determined prior to closing.

The parties agreed to close "as soon as practicable," and the purchase agreement was later amended to provide a closing date of October 14, 2013. A second addendum to the purchase agreement moved the closing date to November 1. Closing did not occur on either date and the parties entered into an oral agreement allowing the Goslins to occupy the property, beginning in December 2013, for a monthly payment generally equal to the Lewises' mortgage payment. Payment records show that the monthly amount paid by the Goslins was $1,050. Cory testified that he gave the Goslins a "deadline" of May 10 each year thereafter to close on the sale. Mick Goslin testified that Cory did not communicate any closing dates beyond those included in the purchase agreement and addendums.

In addition to the $1,000 deposit made on September 11, 2013, and their monthly occupancy payments, the Goslins made $23,000 in payments towards the total purchase price during April and May 2016.

In April 2018, after closing still had not occurred, the Lewises served the Goslins with a notice of termination of the lease agreement. Between April 25 and May 3, the Goslins made two additional payments to the Lewises totaling $8,500 in an effort to close by May 10. On April 26, the Goslins also received a letter from their bank indicating that they had been preapproved for a loan of up to $115,000 to purchase the property. The approval of the loan was subject to obtaining a satisfactory appraisal of the property and an underwriter's final review of all the information prior to closing.

On June 1, 2018, the Lewises filed a complaint for forcible entry and detainer to evict the Goslins from the property. On July 17, the Goslins filed a notice of interest for the property with the Washington County Register of Deeds.

On August 26, 2018, the Lewises sent a letter to the Goslins stating that closing would occur in the next 30 days, at a date and time of the Goslins choosing. If closing did not occur, the Lewises indicated that another eviction suit would be filed as well as claims for damage to the property. On September 30, Cory sent a text message to Beth stating that he was raising the property's rent to $3,000 per month and that the Goslins would be evicted if they did not comply. In November, the Lewises stopped cashing the Goslins' monthly payment checks.

The Lewises' filed a complaint against the Goslins on February 8, 2019, seeking restitution of the property, damages, and a declaratory judgment as to the rights of the parties. The complaint detailed the failure of the Goslins to close on the property, even while making several payments toward the purchase price. The complaint also stated that the Goslins had been renting the property since 2013 pursuant to an oral agreement with the Lewises, but had refused to vacate the premises despite being served with two notices of termination in April and December of 2018, respectively.

On April 1, 2019, the Goslins filed a counterclaim against the Lewises seeking a declaratory judgment regarding the remaining amount owed by the Goslins on the property, specific performance for the sale of the property, and damages for breach of contract and unjust enrichment. The counter claim alleged that the parties had agreed that a portion of the Goslins' monthly payments would be applied toward the purchase price of the property. The Goslins also outlined additional payments made to the Lewises towards the purchase price. The Goslins alleged that they had repeatedly advised the Lewises that they were able to close on the property, provided that the Lewises credited the Goslins with payments already made, and that the Lewises had failed and refused to close.

On January 1, 2020, the Lewises' filed an amended complaint for a decree of foreclosure, order of sale, and to quiet title against the Goslins; as well as against Wells Fargo Financial National Bank, Trustee; Wells Fargo Bank NA, Trust Deed Beneficiary; Timothy and Kathy Welsh; the Washington County Planning and Zoning Administrator; and John Does and all person or parties having some interest in the property. The amended complaint noted that the Welshes had accepted the return of their down payment for the property and had abandoned their interests. Among other relief, the amended complaint requested that the district court determine the Welshes' notice of interest filed with the Washington County Register of Deeds to be null and void, issue an order of sale, and convey title to the successful purchaser.

The Goslins filed a cross claim, also alleging that the Welshes had made no demand to close and requesting the district court to order that the Welshes' notice of interest was null and void and that any interest the Welshes had to the property was extinguished.

The Lewises filed a second amended complaint for a decree of foreclosure and to quiet title. As to the Goslins, the Lewises alleged that after entering into the 2013 purchase agreement, the Goslins took possession of the property and allowed waste to occur. Further, the Lewises alleged that the Goslins breached the contract as, more than 6 years after it had been entered into, the Goslins had never tendered the purchase price, the transaction was never closed, and the title was never conveyed by warranty deed. The Lewises also alleged that the Goslins had failed to make rental payments from June 2018 to November in the amount of $6,300.

The Lewises requested that the district court extinguish the Welshes' interest and award damages, as the Welshes had retained a cloud on the title after being asked by the Lewises to remove their interest. The Lewises also sought a determination by the district court that they were the lawful owners of the property in question, their interests were superior to all parties except the Wells Fargo defendants, all interests of the Goslins were foreclosed, the Goslins had breached their lease and owed the Lewises $6,300, and to quiet title.

On November 10, 2020, the Lewises, Goslins, and Welshes filed a joint stipulation to dismiss the Wells Fargo defendants from the Lewises' second amended complaint. The parties agreed that Well Fargo's first lien position on the property would not be affected or altered by the Lewises' suit. The district court entered an order on November 12 granting the joint stipulation and dismissing Wells Fargo from the Lewises' second amended complaint.

On March 17, 2021, the Lewises and Goslins filed a joint stipulation to dismiss the Welshes as defendants from their respective claims because both parties had reached a full and final settlement with the Welshes. The following day, the district court entered an order granting the joint stipulation and dismissing the Welshes from the Lewises' second amended complaint and the Goslins' cross claim entirely.

On March 22, 2021, the Welshes filed a "release of lis pendens" with the Washington County Register of Deeds, releasing and canceling their interest in the Lewises' property.

2. TRIAL AND ORDER

A trial was held on April 28, 2021. Cory, Mick, and Beth provided testimony and the following evidence was adduced. Additional evidence will be referenced as necessary in our analysis.

(a) Execution of Purchase Agreement

Both Cory and Mick agreed that the October 2013 purchase agreement set the purchase price for the total 11.4 acres at $95,000 plus $78,300 (price contained in the July 2013 Welsh addendum), for a total of $173,300.

Mick testified that, prior to signing the purchase agreement, Cory indicated to the Goslins that he did not believe the lot split contemplated in the purchase agreement would be approved, as he had been denied a previous lot split request. The Goslins conducted their own title search and became aware that the Welshes had filed a notice of interest with the Washington County Register of Deeds. Mick stated that he advised Cory about the existence of the Welshes' notice of interest prior to the parties entering into the purchase agreement. Cory acknowledged that in the event a title commitment showed a title defect, the purchase agreement provided the Lewises with a reasonable amount of time to cure the defect.

Both Cory and Mick agreed that the two closing dates added by addendum to the purchase agreement, October 14 and November 1, 2013, were selected by the Lewises. Mick testified that closing did not occur on either day because the Goslins were waiting on the outcome of the Welshes' purchase agreement. Cory acknowledged that he did not take any action when November 1 passed without closing occurring.

Cory testified that he advised the Goslins that the Welshes were no longer purchasing a portion of the property in June 2014. Cory never received any writing which extinguished the Welshes' interest in the property as "verbally they had just told me that they were done." He acknowledged that he had done nothing to foreclose the Welshes' interest in the property.

Mick was informed by two different banks that closing could not occur on the property due to the Welshes' notice of interest. Mick testified that he repeatedly explained to Cory that the Welshes needed to extinguish their interest in the property in writing before the Goslins could proceed with closing. Cory testified that the Goslins had not made him aware that they were unable to close due to the Welshes' notice of interest until 2017.

### (b) Occupancy of Property

Cory testified that the Goslins moved onto the property around December 13, 2013, and entered into an oral agreement to pay monthly rent to cover the home's mortgage. Cory believed that the Goslins would be able to close shortly after moving onto the property. Checks entered into evidence reflect that the Goslins made a monthly payment of $1,050 to Cory from December 2013 until April 2021, the time of trial.

Mick testified that the Goslins made an oral agreement to make monthly payments to the Lewises and that the "principal part of the payment" would be applied to the purchase price of the property at closing. Mick noted that the monthly payment included the principal of the Lewises mortgage and as well as interest, taxes, and insurance.

Although Cory orally extended the closing date to May 10 each year beginning in 2014, he acknowledged that these deadlines were not conveyed in writing and that he continued accepting the Goslins' payments when the closing dates passed without action.

### (c) Alleged Credit for Repairs

In June 2014, a large hailstorm damaged the home and barn on the property. Cory filed a homeowner's insurance claim and received a $28,531.89 settlement. Because Mick was a contractor, Cory informed him that the Goslins could repair the property and if the parties closed by May 10, 2015, Cory would subtract the amount of the insurance settlement from the purchase price of the property.

Mick testified that he and Cory made an agreement for the settlement amount to be credited to the purchase price in exchange for repairs, but denied that the agreement was contingent on a closing deadline of May 10, 2015. Mick created an estimate of what his contracting business would charge to repair the property and provided it to Cory in March 2015. According to Mick, Cory responded "if you'll just take the insurance money off what you owe me for the property, you can fix the property the way you want to."

Mick also provided Cory with an invoice once the repair work was completed, totaling $35,022. Mick explained that the invoice was not a payment demand but documentation of the

completed repair work, as Mick understood that he would be given credit for the insurance settlement on the purchase price. The invoice details extensive repairs done to the property, including repairing the roof, replacing windows, and applying new stucco to the exterior of the home. Mick indicated that but for the agreement to credit the Goslins with the insurance settlement, he would not have performed the repair work.

A handwritten statement sheet dated March 13, 2015, was entered into evidence. The statement sheet provided, "[t]he insurance money Cory Lewis receives for the damages from the 6/13/14 hailstorm will be applied to what the Goslins owe the Lewis' [sic] for [the property]." The statement bore the signatures of Cory, Mick, and Beth. However, Cory denied signing the statement sheet, and claimed it was a forgery, noting that the "C" in the signature did not match how he usually signs his name.

Mick recognized the statement sheet as a page from his statement book written in Beth's handwriting. Both Mick and Beth testified to being present when all three signed the statement sheet and both denied forging Cory's signature.

(d) Additional Payments and Attempts to Close

In the spring of 2016, the Goslins paid the Lewises a total of $23,000. Cory testified that this amount was to make up the difference between what the Goslins' owed on the property and the amount they were able to borrow from a bank for the purchase. Cory testified that at the time of these payments, he had the intention of closing on the property regardless of the closing dates included in the purchase agreement.

Cory testified to attempting to close multiple times in June 2016 without success. From the fall of 2016 to the spring of 2017, the Goslins provided Cory with many excuses for their failure to close, mostly related to their inability to access a loan for the property.

Mick testified that when they received the preapproval letter from their bank in April 2018 in the amount of $115,000, they had cash reserves to pay the difference between the purchase price on the property and the amount of the bank's loan. Mick stated that closing did not occur not because the Goslins could not pay for the property, but because Cory never set a closing date, the Welshes' interest in the property still existed, and the parties did not agree on the final purchase price. A letter dated June 6, 2018, from Goslins' attorney to Cory's attorney noted that the purchase agreement had not been rescinded or revoked by the Lewises and that the Goslins were willing and able to close on the entire parcel. A response letter from Cory's attorney, dated August 21, 2018, stated that the remaining balance owed on the property was $150,330. The balance did not include credit for the hail storm insurance settlement or any of the Goslins' monthly payments. Beth testified that she believed the Goslins owed $100,000 on the property after accounting for the $23,000 in lump sum payments, the hailstorm insurance settlement, and a mortgage balance reduction due to their monthly payments.

(e) Eviction and Revocation Attempts

In 2018, Cory attempted to evict the Goslins and stopped depositing their monthly checks. Cory conceded that the Goslins sent him monthly rent checks from June to November 2018 and that he either sent them back, threw them away, or tore them up. Cory testified that the Goslins

were "very aware" that he was no longer cashing their checks, but acknowledged that his claim for $6,300 was not by virtue of the Goslins' failure to pay.

Cory acknowledged that he never rescinded the purchase agreement in writing. Additionally, none of the text messages entered into evidence that were sent by Cory to the Goslins indicated that should the Goslins fail to close by a certain date, he would rescind the purchase agreement. Cory believed that filing the initial complaint against the Goslins also ended the contract with them.

Both Mick and Beth testified that they never received any communication from the Lewises or their attorney regarding a date by which closing needed to take place. After the dates included in the purchase agreement by addendum had passed, a closing date was never set by either party.

### (f) District Court's October 2021 Order

In an order entered on October 1, 2021, the district court found that the purchase agreement was a valid and legally enforceable contract and further found that the Goslins had substantially complied with the terms of the contract. The court accepted the testimony of Mick that the Goslins had always been ready, willing, and able to close on the purchase of the property. In addition, the court noted that the Goslins had paid substantial sums of money toward the purchase price and had presented a preapproval letter from their bank for $115,000. As a result, the court found that the Goslins had met their burden of proof to show that they were entitled to specific performance on their counterclaim.

The district court also found that the amount that the Goslins were required to pay for the entire 11.4 acre property pursuant to the purchase agreement was $120,798.11. The court determined that the purchase price was $78,330, as contemplated in the Welsh addendum, plus $95,000, as contemplated in the Goslins' purchase agreement, for a total of $173,330. The court then subtracted $1,000 (Goslins' September 2013 deposit), $28,531.89 (insurance proceeds received by Cory related to the June 2014 hail storm), and $23,000 (cash payments made by the Goslins in April and May 2016), for a remaining balance of 120,798.11. The court did not credit the Goslins for the monthly rental payments that were made to the Lewises beginning in December 2013.

Finally, the district court found that because Cory had testified to receiving all monthly payments from the Goslins, the Lewises did not meet their burden of proof to show that they were entitled to a judgment for nonpayment of rent between June and November 2018.

Because the district court found the Goslins had carried their burden of proof on their claim for specific performance, the court ordered the parties to close on the sale of the property within 60 days from the entry of the order. The court ordered that the remaining terms of the purchase of the property to be those set forth in the purchase agreement, including that the Lewises be required to finance up to $55,000 of the amount still due. The court also found that the Welshes had no right, title, or interest in the property.

### 3. POSTTRIAL PROCEEDINGS

On October 11, 2021, the Lewises filed a motion for reconsideration regarding the issue of $6,300 owed by the Goslins for rent from November 2018 to June 2019. The Lewises alleged that

though the Goslins had written monthly checks during this period, no actual transfer of funds occurred and the checks had since expired. A hearing on the matter was held on November 23.

While their motion for reconsideration was pending before the district court, the Lewises filed a notice of appeal on October 29, 2021. Because the motion for reconsideration had not yet been resolved, this court dismissed the appeal for lack of jurisdiction. See *Lewis v. Goslin*, 30 Neb. App. xxiv (No. A-21-870, Nov. 4, 2021).

On December 1, 2021, the Lewises filed a motion alleging that the Goslins had failed to close on the property by November 30, as required by the court's October 1 order. The Lewises requested that the court find that the Goslins had lost their opportunity to close due to failure to comply with the court's imposed deadline. A hearing on the matter was held on December 21.

On December 3, 2021, the Goslins filed an application for order to show cause, alleging that the Lewises had willfully violated the district court's October 1 order. An affidavit in support by the Goslins' attorney was referenced in the application. The affidavit details correspondence between the parties' attorneys wherein they made an effort to set a closing date for the property and to establish a timeline of posttrial actions taken by the Lewises, including filing a motion for reconsideration and notice of appeal, and express concern that the Lewises would not be able to comply with the court's requirement to carryback financing, which they promise to discuss further. The affidavit asserted that given the Lewises' actions, it was disingenuous to suggest that the delay in closing was due to the Goslins' inaction. Additionally, the court's October 1 order did not state that if closing did not occur in 60 days from the order, the Goslins' would not be permitted to purchase the property. The Goslins' application requested that the Lewises be required to close on the property in 30 days or less, the Goslins not be required to make monthly payments beginning December 1, and the Lewises be ordered to pay all costs incurred by the Goslins.

The district court entered an order on February 1, 2022, denying the Lewises' motion for reconsideration. The court noted that the Lewises' second amended complaint made allegations related to unpaid rent from June to November 2018, but in their motion for reconsideration, made allegations related to unpaid rent for a different period; from November 2018 to June 2019. The court found that throughout Cory's testimony at trial he acknowledged that the Goslins were "still paying rent" while they lived on the property and that at no time did he ask the Goslins for replacement payments for the checks he intentionally destroyed or returned. Cory testified that the Goslins never missed a monthly payment and as such, his testimony was inconsistent with the specific allegations contained in the Lewises' second amended complaint.

The district court entered an order on February 11, 2022, denying the Lewises' motion for an order confirming that the Goslins had lost their opportunity to close on the property and the Goslins' application for order to show cause. The court found that because both parties had made substantial progress in closing on the property, both parties were directed to close on or before April 11 in a manner consistent with the court's previous October 1 order.

On February 15, 2022, the Lewises filed a motion requesting a confirmation by the district court that the Lewises have a secured interest in the court-ordered loan of up to $55,000 and would be considered senior lienholders. The Lewises also requested that the court order a promissory note, deed of trust, and subordination agreement be executed during closing if the Goslins chose to utilize the Lewises' $55,000 loan. A hearing on the matter was held on February 28. On March 2, the court filed a journal entry denying the motion.

On March 2, 2022, the Lewises filed a second notice of appeal. The following day, the Lewises filed a motion to set supersedeas bond for the appeal at $25,000. A hearing on the matter was held on April 5. Also on March 3, the Goslins filed a second application for order to show cause, alleging that the Lewises had refused to comply with the district court's October 1 and February 11 orders. The Goslins' application again requested that the Lewises be required to work in good faith to close on the property in 30 days or less, the Goslins not be required to make monthly payments beginning March 1, and the Lewises be ordered to pay all costs incurred by the Goslins.

On March 10, 2022, the Goslins filed a motion to dismiss the Lewises' March 3 motion to set supersedeas bond. The Goslins alleged that Neb. Rev. Stat. § 25-1916 (Reissue 2016) provided a deadline to post a supersedeas bond of 30 days after the entry of a final order. Because the district court entered its order denying the Lewises' motion for reconsideration on February 1, the last day for the Lewises to post a supersedeas bond was March 3, the day they had filed their motion to set the bond. Because no supersedeas bond had been posted, the Goslins alleged that the Lewises had not complied with § 25-1916 and their motion to set supersedeas bond should be denied.

On March 17, 2022, the district court entered an order to show cause and ordered the Lewises to appear at a hearing on April 5 to show cause as to why they should not be held in contempt for violating the court's previous orders.

A hearing on the Lewises' motion to set supersedeas bond was held on April 5, 2022. The following day, the district court filed an order denying the Lewises' motion to set supersedeas bond. The court found the motion to be untimely, as more than 30 days had elapsed since the date of the final order. The order continued the hearing on the Lewises' show cause application until April 20, as the parties had until April 11 to close on the property.

On April 18, 2022, the Goslins filed a motion to set aside the order to show cause because the sale of the property had closed on April 11. The district court granted the order the following day and vacated its previous order to show cause.

On August 3, 2022, the Goslins filed a suggestion of mootness with this court. The Goslins alleged that the Lewises had transferred all right, title, and interest in the property to the Goslins on April 11 via a survivorship warranty deed and the Lewises had recorded the deed in the Washington County Register of Deeds on April 12. The Goslins had executed a deed of trust to secure the loan of $55,000 made by the Lewises and recorded the deed of trust on April 12. During closing, both parties had executed a settlement statement which provided that the amount owed by the Goslins for the property was $120,798.11. The Goslins argued that the Lewises lacked a legally cognizable interest in the outcome of litigation and the issues initially presented, primarily the enforceability of the purchase agreement, were no longer alive. Additionally, the Goslins argued that because the Lewises failed to post a supersedeas bond and had already transferred the title to the property, their appeal was moot.

On August 24, 2022, this court denied the Goslins' suggestion of mootness without prejudice and allowed the Lewises' appeal to proceed.

### III. ASSIGNMENTS OF ERROR

The Lewises assert, restated, that the district court erred by (1) finding that the purchase agreement was unambiguous and sufficiently certain and definite to be valid; (2) not considering

the prior agreement between the Lewises and Welshes when interpreting the purchase agreement; (3) finding that the Lewises had waived their right to rescind the purchase agreement by their conduct; (4) considering a notice of interest filed by the Welshes on the property to be a valid reason for the Goslins to not attempt to close on the property; (5) finding that the Goslins were ready, willing, and able to close on the property because of a pre-approval letter from the bank; (6) considering non-cashed checks from the Goslins to the Lewises to be payment for rent; (7) finding that the Goslins did not forfeit their right to close on the property by failing to do so within the previously ordered 60-day period; (8) ordering the Lewises to finance $55,000 of the purchase price; and (9) ordering the Lewises to be bound to a financial loan without considering changes in circumstances.

## IV. STANDARD OF REVIEW

Mootness does not prevent appellate jurisdiction. *Weatherly v. Cochran*, 301 Neb. 426, 918 N.W.2d 868 (2018). But, because mootness is a justiciability doctrine that operates to prevent courts from exercising jurisdiction, an appellate court reviews mootness determinations under the same standard of review as other jurisdictional questions. *Id*. A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision. *Green v. Seiffert*, 304 Neb. 212, 933 N.W.2d 590 (2019).

Whether a declaratory judgment action is treated as an action at law or one in equity is to be determined by the nature of the dispute. *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010). The determination of rights under a contract is a law action. *Id*. In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. The appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id*.

When a declaratory judgment action presents a question of law, an appellate court has an obligation to reach its conclusion independently of the conclusion reached by the trial court with regard to that question. *Id*. The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below. *Id*. And whether a contract is ambiguous is a question of law. *Id*. The meaning of an ambiguous contract, however, is generally a question of fact. *Id*.

## V. ANALYSIS

### 1. MOOTNESS

Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022).

In the absence of a supersedeas, a judgment or final order retains its vitality and is capable of being executed during the pendency of the appeal. *Production Credit Assn. of the Midlands v. Schmer*, 233 Neb. 785, 448 N.W.2d 141 (1989). Where a decree orders the sale of land, the law in Nebraska explicitly requires that a supersedeas be set out as stated in § 25-1916(3). *Id*. A

supersedeas is a statutory remedy. It is only obtained by a strict compliance with all the required conditions, none of which can be dispensed with. *Id*. If a judgment is not superseded, it is effective notwithstanding appeal. *Enterprise Bank v. Knight*, 20 Neb. App. 662, 832 N.W.2d 25 (2013).

Additionally, the law is clear that "'[w]hen an ordinary law action is pending in this court on appeal, and the parties by agreement settle and dispose of the whole controversy, it becomes, so far as this court is concerned, a moot case, and will not be further investigated, but will be dismissed.'" *D B Feedyards v. Environmental Sciences*, 16 Neb. App. 516, 745 N.W.2d 593 (2008), quoting *Schlanbusch v. Schlanbusch*, 103 Neb. 588, 173 N.W. 580 (1919). When a party voluntarily complies with the mandate of the trial court, satisfying the judgment, the appeal no longer presents an actual controversy, but an abstract question. *D B Feedyards v. Environmental Sciences, supra*.

The rule in Nebraska is that satisfaction of a judgment does not destroy the right to appeal when the record shows that the satisfaction was coerced by legal process during the pendency of the appeal. See *id*. The burden falls to the appellant to demonstrate, by affidavit, that appellant's satisfaction of the judgment was not voluntary, but was instead the result of coercion by legal process. *Id*. Our rule requires a case-by-case examination of the facts. *Ray v. Sullivan*, 5 Neb. App. 942, 568 N.W.2d 267 (1997).

Although the Lewises did not file an affidavit, they did file a response to the Goslins' suggestion of mootness. The Lewises assert generally that the appeal is not moot because if the judgment of the district court for specific performance of the purchase agreement is reversed, the property could be transferred back to them. The Lewises cite *Koetter v. Koetter*, No. A-17-1066, 2018 WL 6629237 (Neb. Ct. App. Dec. 18, 2018) (not designated for permanent publication) in support of their argument that the appeal should not be dismissed as moot. *Koetter* involved a partition by sale of real property. One of the tenants in common appealed the district court's order confirming the sale of the property. Because the appellant did not file a supersedeas bond, the district court denied his motion to stay the sale. At the time of the appeal, the property had been sold and the title transferred, and the district court had ordered the balance of the sale proceeds be distributed to all tenants in common.

In *Koetter*, this court declined to dismiss the appeal for mootness. We found that the issues of the case were not moot, rather, it was the relief sought by the appellant which was complicated by the closing of the sale and the lack of supersedeas bond.

In the present case, the Lewises' effort to post a supersedeas bond, although denied by the district court, together with the other posttrial activities, lead us to conclude that the transfer of the property was not as a voluntary act, but in response to coercion by the legal process. And, similar to our finding in *Koetter*, while the closing of the sale and lack of a supersedeas bond pose potential complications to the relief sought by the Lewises, we decline to find such renders this appeal moot.

Accordingly, we proceed to consider the merits of the appeal.

### 2. PURCHASE AGREEMENT VALIDITY

The Lewises allege that the district court erred in finding that the Goslins' purchase agreement was unambiguous and sufficiently certain and definite to be valid. The Lewises also allege that the district court erred by not considering the Goslins' purchase agreement within the context of the Welshes' purchase agreement and addendum, as the agreements referenced each

other and contained contradicting terms. The Lewises assert that the Goslins' purchase agreement states that the tract to be conveyed to the Goslins shall contain "at least" 4 acres, and because the Welshes' purchase agreement was for 8.4 acres of the Lewises' 11.4 acres, the Goslins' purchase agreement is impossible. The Lewises further argue that the Goslins' purchase agreement was uncertain because, at the time of its execution, it was unknown how many acres the Welshes would be purchasing.

A court interpreting a contract must first determine as a matter of law whether the contract is ambiguous. *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010). A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. *Id*. A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id*.

The Goslins' purchase agreement makes reference to a prior purchase agreement with the Welshes for 8.4 acres of the Lewises' land, provides a metes and bounds description, and refers to those 8.4 acres as the "Easterly Acres." The Goslins' purchase agreement also states that the Goslins desired to purchase 3 acres of Lewises' land, referred to as the "Westerly. . . acres," containing the residential home and "all other buildings and attachments to said land." The purchase agreement notes that if the Welshes "back out" of their purchase for the Easterly Acres, the Goslins "shall purchase the entire tract of 11.4 acres. . ." A purchase price was set for the "first 3.0 +_ acres" at $95,000, and for the "entire 11.4 +_ acres" at $95,000 plus "the purchase price of the Easterly Acres contained in the agreement with the Welsh's [sic]." Both Cory Lewis and the Goslins agreed at trial that the price contained in the Welshes' purchase agreement for 8.4 acres was $78,330.

The Lewises entered into two separate contracts for the sale of their property, with the Welshes and Goslins, respectively. As the district court found in its October 1 order, the Goslins' purchase agreement provides for a contingency in the event that the Welshes did not purchase the Easterly Acres, which would allow the Lewises to sell the entire 11.4 acres to the Goslins. The inclusion of this contingency in the Goslins' purchase agreement does not render the agreement indefinite. See *Frenzen v. Taylor*, 232 Neb. 41, 439 N.W.2d 473 (1989) (finding that when contractual duty is subject to occurrence of specific contingency or event as condition, condition must occur before party is obligated to perform contractual duty unless nonoccurrence is excused). The Goslins' purchase agreement was definite in terms of the size of the tract the Goslins were contracting to buy at the time the agreement was executed, the Westerly 3 acres for $95,000; and in the event the Welshes rescinded their agreement, the purchase agreement was definite in terms of the size of the tract the Goslins were contracting to buy the Easterly 8.4 acres in addition to the Westerly 3 acres for a total of $173,300.

While the Goslins' purchase agreement does at one point state that the tract to be conveyed from the Lewises to the Goslins shall "contain at least 4.0 +_ acres," we do not find this one reference to 4 acres sufficient to render the purchase agreement ambiguous. A contract must receive a reasonable construction and must be construed as a whole, and if possible, effect must be given to every part of the contract. *Lassalle v. State*, 307 Neb. 221, 948 N.W.2d 725 (2020). The 4 acres is not considered in the purchase agreements' references to the Easterly Acres (8.4 acres) and the Westerly Acres (3 acres). Neither is the 4 acres considered in the two scenarios the

purchase agreement contemplates; the Goslins purchasing 3 acres or purchasing the entire parcel if the Welshes rescind their own agreement for 8.4 acres. Thus the purchase agreement's singular reference to 4 acres does not create two reasonable but conflicting interpretations or meanings. See *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010). This assigned error fails.

### 3. WAIVER OF LEWISES' RIGHT TO RESCIND

The Lewises assign that the district court erred in finding that their actions of continually moving the closing date constituted a waiver of the requirement that the Goslins close in a reasonable amount of time. The Lewises assert that specific performance should not have been allowed by the district court as the Goslins failed to close on the property for 5 years. The Lewises also argue that they had rescinded the Goslins' purchase agreement multiple times.

In an ordinary contract for the sale of real estate, time is not of the essence unless provided in the agreement itself or is clearly manifested by the agreement construed in the light of surrounding circumstances. *Silverleaf Investments v. Devastator Real Estate*, 28 Neb. App. 278, 943 N.W.2d 454 (2020). Where time is not of the essence, performance must be within a reasonable time. *Id*. When a contract expressly provides for a specific closing date, performance is normally due within a reasonable time after the date mentioned. *Id*. What constitutes a reasonable time for the performance of a contract must be determined from the general nature and circumstances of each case. *Snowdon Farms v. Jones*, 8 Neb. App. 445, 595 N.W.2d 270 (1999).

The Goslins' purchase agreement did not originally include a closing date. The purchase agreement was twice amended to include a closing date of October 14, 2013, and later November 1, 2013. These dates passed without any action on closing occurring, but the Lewises allowed the Goslins to move onto the property in December 2013 and created an oral tenancy agreement. At trial, Cory testified to orally moving the closing date to May 10, 2014, and then May 10 of each following year when closing would fail to occur. Mick testified that after the closing dates added to the purchase agreement by addendum passed, no closing date was ever set by the Lewises.

The Goslins made a $1,000 deposit in September 2013, paid $23,000 towards the total purchase price during April and May 2016, and as tenants made monthly payments which covered the Lewises' mortgage. Cory testified that when he received the payments in 2016, he had the intention of closing on the property regardless of the closing dates included in the purchase agreement. In a 2019 deposition, Cory testified that as of March 2018, the Lewises were still working with the Goslins to complete the sale the property. In August 2018, the Lewises' attorney sent the Goslins a letter stating that closing should occur within 30 days.

The Lewises argue that they did not waive the closing date, rather Cory orally set a closing date of May 10, 2014, and then extended the closing date to May 10 every year for 4 more years. We note that Mick testified that the closing date was never orally extended. Regardless, by Cory continually moving the closing date when closing did not occur, the closing date was rendered meaningless as a term of the Goslins' purchase agreement. A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive. *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019).

- 13 -

The Lewises also argue that they rescinded the Goslins' purchase agreement multiple times. The Lewises brought prospective buyers to the property in the summer of 2017 and in the spring of 2018, of which the Goslins were aware. The Lewises also sent the Goslins a notice to quit in April 2018, informing them that they had until May to leave the property.

In determining whether a rescission took place, courts look to all the circumstances of a case. See *Fritsch v. Hilton Land & Cattle Co.*, 245 Neb. 469, 470, 513 N.W.2d 534, 537 (1994). Cory's testimony at trial evidences a willingness to work with the Goslins on the sale of the property from September 2013 to September 2018. Cory also testified to never rescinding the purchase agreement in writing. Additionally, the recession methods used by the Lewises did not communicate sufficient disaffirmance to the Goslins. The Lewises did not make the Goslins aware that any of the prospective buyers brought to the property would be taking their place in the sale, and the notice to quit sent by the Lewises sought to terminate the Goslins' tenancy, rather than rescind the purchase agreement. It was not until the Lewises filed their initial complaint in February 2019 that they sought to rescind the purchase agreement. See *Fritsch v. Hilton Land & Cattle Co., supra* (when party seeks aid of court to rescind contract, bringing of action is sufficient disaffirmance of contract for purposes of action).

Based on the general nature and circumstances of the case, as well as evidence adduced at trial, we find that Cory waived the closing date until at least September 2018, or 30 days from the date of the August 2018 letter. See *Snowdon Farms v. Jones*, 8 Neb. App. 445, 595 N.W.2d 270 (1999). The district court did not err in concluding that the Lewises had waived the requirement that the Goslins close in a reasonable amount of time. This assignment of error fails.

### 4. WELSHES' NOTICE OF INTEREST

The Lewises allege that the district court erred in considering a notice of interest filed by the Welshes to be a valid reason for the Goslins to not attempt to close on the property. The Lewises argue that the Goslins were aware of the Welshes' filed notice of interest at the time of their purchase agreement and understood that the "'pseudo' defect would not hinder underwriting." Brief for appellant at 23. Further, the Lewises assert the Goslins' claim that the notice of interest was restricting the closing "was only a ploy to buy time until they hopefully could come up with the money to close." Brief for appellant at 24. The Lewises concede that the notice of interest was a title defect, but argue that they had until closing to deliver marketable title.

The Welshes filed their notice of interest in August 2013, but rescinded their purchase agreement for 8.4 acres in the summer of 2014. At trial, Mick testified that he was informed by two different banks that closing could not occur on the property due to the Welshes' notice of interest. Mick also testified to relaying this information to Cory. Text messages sent from Mick to Cory in December 2017 further evidence communication that the notice of interest needed to be extinguished before closing. Mick testified that closing did not occur prior to trial, not because the Goslins could not pay for the property, but because the Welshes' interest in the property still existed, among other reasons. The Welshes did not release their interest in the property until a few weeks before trial.

While the Goslins were aware of the Welches' notice of interest at the time they executed their purchase agreement, the record indicates that the notice of interest did inhibit the Goslins' ability to close on the property through their bank. The district court accepted Mick's testimony

that the Goslins had always been ready, willing, and able to close on the purchase of the property. In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. See *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010). We find no clear error in the district court's determination that the notice of interest impacted the ability of the Goslins to close on the purchase agreement. This assignment of error fails.

The Lewises also argue that the district court erred in finding that they made no effort to clear the title defect and that this inaction ran contrary to the title insurance provision of the Goslins' purchase agreement. However, because we have already found that the Welshes' notice of interest delayed closing, we need not address this argument. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Cain v. Lymber*, 306 Neb. 820, 947 N.W.2d 541 (2020).

### 5. GOSLINS' PREAPPROVAL LETTER

The Lewises allege that the district court erred in finding that the Goslins were ready, willing, and able to close on the property based on the April 2018 preapproval letter. The Lewises argue that the preapproval letter included conditions precedent (obtaining a satisfactory appraisal of the subject property, a clear termite inspection, and underwriter's final review), none of the conditions were satisfied, and the Goslins were never willing to set a closing date. The Lewises also note that the preapproval letter does not make a specific reference to their property.

As noted above, the district court accepted Mick's testimony that the Goslins had always been ready, willing, and able to close on the purchase of the property pursuant to the terms set forth in the purchase agreement. We decline to reweigh the evidence which was before the district court, including the preapproval letter and the parties' testimony. See *Davenport Ltd. Partnership v. 75th & Dodge I, L.P., supra*. This assignment of error fails.

### 6. NON-CASHED RENT CHECKS

The Lewises allege that the district court erred in considering the non-cashed checks from the Goslins as payment for the property's rent. The Lewises argue that they never received legal tender for the months between December 2018 and June 2019 and thus the Goslins owe $6,300 for past rent. The Lewises cite to the policies of the U.S. Department of Labor and the Code of Federal Regulations to assert that "[i]t does not matter why, how, or when Mr. Lewis did not cash the checks, it only matters that he did not cash the checks." Brief for appellant at 25.

As a general rule, a tenant possesses a right to a demand for payment of rent and to a reasonable opportunity to pay. *Kleven v. Brunner*, 229 Neb. 883, 429 N.W.2d 384 (1988). A waiver, according to the generally accepted definition, is the voluntary and intentional relinquishment of a known right, claim, or privilege. *Id.*

*Kleven v. Brunner* involved the owner of a property's action for forcible entry and detainer against the mortgagor's lessee after the owner had foreclosed on a contract sale against the mortgagor. The Nebraska Supreme Court examined whether the owner's accepting but refusing to cash two checks from the lessee following the foreclosure waived the owner's claim to rent. In response to both payments, the owner sent the lessee a letter advising her that she did not believe

that a lease existed and that she would "not and will not negotiate the check until an understanding is agreed upon as I informed you in our conference." *Id*. at 885, 429 N.W.2d 386.

The court in *Kleven* determined that the record clearly indicated that the owner's refusal to cash two monthly rent checks was predicated on her belief that she was acting in a manner necessary to preserve her right to recover the earlier rents owed to the mortgagor. Further, the owner's words or actions did not rise to the level of waiver as the owner never voluntarily relinquished her right, claims, or privilege to collect the rents owed her under the terms of a valid lease.

As the district court noted, while the Lewises' second amended complaint alleged that the Goslins were responsible for unpaid rent from June 2018 to November 2018, their motion for reconsideration alleged that the period at issue was from November 2018 to June 2019. Regardless of the rental period, Cory testified that he received a rent check from the Goslins for every month from December 2013, when the Goslins moved onto the property, through April 2021, the time of trial. Cory conceded that his claim for $6,300 was not because the Goslins had failed to pay, but because he has refused to cash their checks. Cory testified to returning, discarding, and destroying several of the Goslins' rent checks.

We find that Cory's actions constitute a voluntary and intentional relinquishment of his right, claim, or privilege to collect past rent of $6,300. Unlike in *Kleven*, where the owner's refusal to cash two retained rent checks was predicated on her belief that she was preserving her right to recover the earlier rents owed to the mortgagor, here, Cory's destruction of the Goslins' rent checks was clearly not an effort to preserve any rights against the Goslins as tenants. Additionally, Cory did not communicate to the Goslins that he was refusing to accept their rent checks. Cory's actions rise to the level of waiver and this assignment of error fails.

### 7. GOSLINS' OPPORTUNITY TO CLOSE

The Lewises allege that the district court erred in finding that the Goslins did not forfeit their right to close on the property by failing to do so within the previously ordered 60-day period. The Lewises argue that the Goslins procrastinated on closing and that "[t]here is clear evidence that the buyers did not use appropriate efforts to get the sale of the property closed. That they did not think the Order was the Order." Brief for appellants at 27.

The Lewises do not detail what specific actions the Goslins failed to take to close on the property. Additionally, the Lewises do not provide any references to the record for the "clear evidence" that the Goslins did not work in good faith to close on the property. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). A generalized and vague assignment of error that does not advise an appellate court of the issue submitted for decision will not be considered except to the extent that it is narrowed by the specific arguments asserted in the appellant's brief. *Finley-Swanson v. Swanson*, 20 Neb. App. 316, 823 N.W.2d 697 (2012). Where an appellant's brief contains conclusory assertions unsupported by a coherent analytical argument, the appellant fails to satisfy the requirement to specifically assign and specifically argue the alleged error. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020). Thus we do not consider this assignment of error.

### 8. Seller Financing Terms

The Lewises allege that the district court erred in ordering the Lewises to finance $55,000 of the purchase price. The district court's October 1 order stated, "if requested by the Goslins, the Lewises shall be required to finance up to $55,000.00 of the amount still due upon the terms set forth therein (amortized for a period of no more than 15 years, 4.5% per annum, etc.)." The Lewises argue that the district court "completely created out of thin air new terms of the contract" and that another provision of the purchase agreement controls. Brief for appellant at 29.

The interpretation of a contract and whether the contract is ambiguous are questions of law. *Lassalle v. State*, 307 Neb. 221, 948 N.W.2d 725 (2020). A contract must receive a reasonable construction and must be construed as a whole, and if possible, effect must be given to every part of the contract. *Id*.

The language of the October 1 order related to financing comes directly from the purchase agreement's provision on purchase price. However, immediately following those terms the agreement states, "[i]f Purchasers purchase the entire 11.4 acres, the amount to be paid at the time of closing and the amount to be financed shall be determined prior to closing." Both parties at trial agreed that the Goslins were purchasing all 11.4 acres from the Lewises. Thus, the amount to be financed by the Lewises was not necessarily $55,000, but was to be determined prior to closing. However, this additional language did not negate the Lewises' obligation to finance part of the purchase price in the event the entire property was purchased. Since closing on the property has already occurred, and we are affirming the district court's order requiring the parties to close on the purchase agreement, we decline to find any reversible error in the district court's order regarding the Lewises' financing.

Finally, the Lewises allege that the district court erred in ordering the Lewises to be bound to a financial loan without considering changes in circumstances. However, because the Lewises provide no related argument in their brief, we do not consider this assignment of error. See *Simons v. Simons, supra*.

### VI. CONCLUSION

The district court did not err in finding the purchase agreement to be a valid contract and granting specific performance. The district court also did not err in finding that the Lewises had waived their right to collect past rent and in ordering the Lewises to finance part of the purchase price.

AFFIRMED.

BISHOP, Judge, participating on briefs.